BOWMAN, Circuit Judge.
Marvin Lumber and Cedar Co. and Marvin Windows of Tennessee, Inc. (collectively “Marvin”) filed a multicount suit against PPG Industries, Inc. (“PPG”). The District Court dismissed several counts and granted summary judgment in favor of PPG on the rest. Marvin appeals, and we affirm in part and reverse in part.
I.
The Marvin companies are Minnesota and Tennessee corporations that manufacture and sell custom-made wooden doors, windows, and other construction products. PPG makes and sells, among other things, wood preservatives, primers, and coatings. The dispute here arose from Marvin’s purchase of wood preservatives from PPG for Marvin’s use in treating its windows and doors.
For several decades, Marvin treated its wood products with a preservative containing pentachlorophenol, called Penta for short, which is effective in preventing premature wood rot and decay caused by moisture penetration. Penta had drawbacks, including toxicity, and starting in the late 1970s, alternative wood treatments began to emerge. PPG makes such a treatment called “PILT,” which stands for “preservative in line treatment.”
Marvin purchased and used PPG’s PILT from 1985 to 1988, along with other PPG products such as primers and topcoats. On April 22, 1994, Marvin filed this suit. The complaint asserts numerous legal theories, but, ultimately, the central allegation is that PPG’s products did not meet Marvin’s expectations in preventing wood rot and deterioration in Marvin’s doors and windows. Specifically, there are thirteen legal theories in the Amended Complaint: (I) contract; (II) express warranty; (III) implied warranty of merchantability; (IV) implied warranty of fitness for a particular purpose; (V) negligence; (VI) strict liabili *876 ty; (VII) fraud and misrepresentation; (VII-XII) violations of several state anti-fraud statutes; and (XIII) fraudulent concealment.
The procedural background of the case is somewhat complicated. We recite only that necessary for our purposes here. On March 17, 1995, the District Court dismissed Marvin’s statutory fraud claims, without prejudice, as having been pled with insufficient particularity. The same decision also dismissed Marvin’s tort claims, including those sounding in common-law fraud, insofar as they related to damage to the goods sold by Marvin, based on Minnesota’s economic loss doctrine. Marvin filed another complaint and on October 13, 1995, a Magistrate Judge issued a Report and Recommendation suggesting that the common-law and statutory fraud claims in the Amended Complaint be dismissed, and the District Court so ordered on October 31, 1995. Marvin then sought and obtained a statutory change from the Minnesota legislature. Relying on this change, Marvin asked the District Court to revise its earlier decisions. Another Report and Recommendation, dated August 6, 1998, suggested denial of such revision and also, on PPG’s motions, recommended summary judgment against Marvin on the remaining claims. The District Court adopted the Magistrate Judge’s recommendations and entered judgment for PPG on January 15, 1999, although it did not adopt the reasoning of the Report and Recommendation in its entirety. See Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 34 F.Supp.2d 738 (D.Minn.1999). Seeking reinstatement of its claims, Marvin has timely appealed.
There are three central issues in this appeal. First, we must decide whether Marvin’s contract claims are barred by the governing statute of limitations. Second, we must decide whether Minnesota’s economic loss doctrine bars Marvin’s tort claims. Finally, we decide whether Marvin is protected by the state statutes on which it bases its statutory fraud claims.
As a diversity action, this case is governed by state substantive law. See Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where the state law is uncertain, our task is to predict how the state supreme court would resolve the issue if faced with it. See Jackson v. Anchor Packing Co., 994 F.2d 1295, 1301 (8th Cir.1993). Except for the causes of action based on Tennessee statutes, the District Court applied Minnesota law and the parties do not argue for the application of any other. Here, we review all of the District Court’s determinations de novo, considering all evidence in the light most favorable to Marvin on summary judgment issues and, with regard to the Rule 12 dismissals, accepting the complaint’s factual allegations as true and construing them in the light most favorable to the- plaintiff. See Anderson v. Franklin County, Mo., 192 F.3d 1125, 1131 (8th Cir.1999).
II.
The Uniform Commercial Code (U.C.C.), adopted in Minnesota, establishes that Article 2 contract claims must be brought within four years of their accrual. See Minn.Stat. § 336.2-725(1) (1998). Ordinary warranty claims generally accrue upon tender of delivery. See id. § 336.2-725(2). Marvin last took delivery of PPG’s product in December 1988 and failed to file suit until April 1994, almost two years too late. Two circumstances might allow the claims as timely: if PPG fraudulently concealed its breach from Marvin or if PPG expressly warranted the future performance of its products. We believe there is a jury question as to the existence of a future performance warranty.
A.
Marvin alleges that PPG fraudulently concealed the PILT defects forming the basis of Marvin’s causes of action, which would toll the statute of limitations until Marvin discovered or had a reason *877 able opportunity to discover the concealed defects. See Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 918 (Minn.1990). To prevail, Marvin must show that PPG fraudulently concealed “the very existence of the facts which establish the cause of action” and that Marvin was “actually unaware” of these facts. Id. at 918-19. Since these are disputes of fact, summary judgment is appropriate only where a reasonable juror could not find fraudulent concealment. See Miles v. A.O. Smith Harvestore Prods., Inc., 992 F.2d 813, 817 (8th Cir.1993). The District Court found that the evidence in the record does not create a genuine issue of material fact on fraudulent concealment. See Marvin Lumber & Cedar Co., 34 F.Supp.2d at 755. We agree.
The substance of Marvin’s ordinary warranty claims is that PPG warranted that PILT would adequately prevent wood rot, but the product failed. The first critical question therefore is whether PPG fraudulently concealed PILT’s alleged failure to prevent rot in Marvin’s wood products. Acts that can constitute fraudulent concealment include outright misrepresentations, see Hines v. A.O. Smith Harvestore Prods., Inc., 880 F.2d 995, 998-99 (8th Cir.1989) (applying Missouri law), or failures to disclose information when a duty of disclosure is present, such as in a fiduciary relationship, see Cohen v. Appert, 463 N.W.2d 787, 790-91 (Minn.Ct.App.1990). No such disclosure duty arises from the arms-length transactions of the parties here. See Metropolitan Fed. Bank v. W.R. Grace & Co., 999 F.2d 1257, 1261 (8th Cir.1993). Misleading partial disclosures, however, may constitute affirmative fraud, see M.H. v. Caritas Family Servs., 488 N.W.2d 282, 288 (Minn.1992), and fraudulent concealment, see Iverson v. Johnson Gas Appliance Co., 172 F.3d 524, 529 (8th Cir.1999) (discussing independent tort of fraudulent concealment). If there is evidence that PPG undertook fraudulently concealing acts, the second question would be whether Marvin still knew or should have known of the facts that make up its cause of action. See Hydra-Mac, Inc., 450 N.W.2d at 919. Because Marvin has not supplied any evidence of the necessary fraudulent acts, we need not reach the second inquiry.
In attempting to make out a triable case of fraudulent concealment, Marvin repeats many of its general contract and fraud claims, alleging that PPG misrepresented PILT’s effectiveness and also that PPG made misrepresentations that, while not directly vouching for PILT’s effectiveness, tend to support it. For example, Marvin alleges that PPG misled Marvin about long-term research supporting PILT’s effectiveness, about PILT’s certification by an industry standards organization, about changes in the formulation and manufacturing process for PILT during the time Marvin bought it, and about the similarity between the type of PILT sold to Marvin and the type sold to a well-known competitor. All of these misrepresentations, Marvin alleges, fraudulently prevented Marvin from learning that PILT was failing. Marvin’s argument fails because, even if PPG fraudulently made such representations, those acts do not constitute fraudulent concealment of Marvin’s ordinary warranty claims.
Two cases are illustrative. In both Hines and Miles, the plaintiffs sued the manufacturer of a particular model of grain elevator that allegedly failed to protect its contents as promised. In both cases, defendant raised a statute of limitations defense. In Hines, the plaintiff alleged that, while inherent and known design defects were the cause of the elevator’s failure, the seller misled Hines by fooling him into believing that the problem was faulty seals, which could be fixed, and the seller attempted to repair the seals. This Court held that a genuine issue of material fact existed as to fraudulent concealment. See Hines, 880 F.2d at 998. In Miles, the plaintiff alleged that the defendant misled her by continually extolling the virtues of the elevator *878 model in printed material, all the while knowing that elevator did not work. This Court held that this conduct did not constitute fraudulent concealment. See Miles, 992 F.2d at 816. We noted that “[i]t would have beén impossible” for the defendant to conceal the facts that gave rise to Miles’s cause of action, because “the evidence was in [Miles’s] yard.” Id. We distinguished Hines, noting that the defendant there “lulled” the plaintiff into believing that the problems with elevator could be, and would be, repaired. Id. at 817.
These cases demonstrate that Marvin’s generalized allegations that PPG fraudulently misrepresented PILT’s effectiveness do not constitute fraudulent concealment, at least where Marvin still had access to the facts that would make out its cause of action. At all times, Marvin had access to each of the very facts that establish Marvin’s breach of contract action, namely PILT’s alleged failure to prevent rot on Marvin’s products. “The oral and written representations [that Marvin relies] on to support [its] fraudulent concealment argument did not, and indeed could not, prevent [Marvin] from discovering that [PPG’s] promises concerning the virtues of [PILT] did not come to pass.” Klehr v. A.O. Smith Corp., 87 F.3d 231, 238 (8th Cir.1996) (applying Minnesota law and analyzing Hines, Miles, and Minnesota cases), aff'd, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (certiorari granted on federal RICO claim only). To make out its warranty claim, Marvin need only show that PILT was not performing as promised, and the facts relating to that claim were not in PPG’s test logs or in the documents relating to PPG’s relationship with other customers, but rather those facts were in the hands of Marvin and its customers. None of PPG’s alleged acts could have covered up the relevant facts.
Marvin comes closest to alleging fraudulent concealment by asserting that PPG misled Marvin about the cause of Marvin’s rot problems. The record reflects that, faced with accusations by Marvin that PILT was failing, PPG told Marvin that PPG believed that Marvin’s construction practices were to blame. At the time, PPG had information which both supported and undercut PILT’s efficacy. For example, PILT’s performance for several other customers had been positive, and laboratory tests of PILT produced many satisfactory results. On the other hand, some tests returned less favorable results, especially some water repellency tests. These facts are not evidence of affirmative fraud. Absent some duty to disclose, not present here, PPG was not required to inform Marvin of the facts that reflected poorly on PILT’s performance. See Metropolitan Fed. Bank, 999 F.2d at 1261. PPG’s denial of liability alone is certainly not fraudulent concealment. See Grand Island Express v. Timpte Indus., Inc., 28 F.3d 73, 75 (8th Cir.1994) (applying Nebraska law). At best, Marvin might be able to prove that PPG was wrong in stating that Marvin’s construction practices resulted in Marvin’s rot problem. But Marvin can point to no evidence that shows that PPG’s representations about the cause of Marvin’s rot problem were fraudulent. See Haberle v. Buchwald, 480 N.W.2d 351, 357 (Minn.Ct.App.1992) (“Central to the concept of fraud is a knowing and intentional statement, act, or refusal to act where a duty to act lies.” (quoting trial court)). Thus, Marvin’s fraudulent concealment claim fails.
B.
We turn to Marvin’s warranty-of-future-performance claims. Under the U.C.C., a warranty explicitly extending to future performance presents an exception to the normal rule as to when a cause of action for breach of warranty accrues. A cause of action for such a breach does not accrue until the breach is discovered or should have been discovered. See Minn.Stat. § 336.2-725(2). Marvin alleges that such a warranty exists here. The District Court concluded the evidence in this case *879 does not present a genuine dispute of material fact with respect to the existence of a warranty of future performance and therefore granted summary judgment to PPG. See Marvin Lumber & Cedar Co., 34 F.Supp.2d at 752-53.
An express warranty is created by “[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain.” Minn.Stat. § 336.2-313(l)(a). “It is not necessary to the creation of an express warranty that the seller use formal words such as Varrant’ or ‘guarantee’ or that the seller have a specific intention to make a warranty....” Id. § 336.2-313(2). Nor is it necessary for the promise or affirmation of fact to be incorporated into a written document; oral representations may create an express warranty, even between sophisticated commercial parties. See, e.g., Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 579-80 (8th Cir.1980) (applying U.C.C. under Arkansas law).
Only a specific type of express warranty, however, will suffice to alter the normal rule of accrual for breach of warranty actions. Under the U.C.C., the warranty must “explicitly extendí ] to future performance of the goods,” Minn.Stat. § 336.2-725(2), or else the buyer’s breach of warranty action accrues on tender of delivery. The courts have vigorously enforced the U.C.C.’s statutory explicitness requirement. See Standard Alliance Indus., Inc. v. Black Clawson Co., 587 F.2d 813, 820 (6th Cir.1978) (collecting cases), cert. denied, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979). Implied warranties cannot, by their very nature, explicitly extend to future performance. See Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc., 23 F.3d 1547, 1550-52 & 1551 n. 3 (9th Cir.1994) (collecting cases).
Moreover, an express warranty of the present condition of goods without a specific reference to the future is not an explicit warranty of future performance, even if the description implies that the goods will perform a certain way in the future. See Ray D. Henson, The Law of Sales § 7.16, at 334-35 (1985). A typical example is Western Recreational Vehicles, where the seller promised that its adhesive would work on the buyer’s new Filón vehicles. This promise, while implicitly touching upon the future performance of the adhesive, did not specifically refer to a future time and therefore did not explicitly extend to future performance. See Western Recreational Vehicles, 23 F.3d at 1553.
This Court has restated the explicitness requirement variously. See Economy Housing Co. v. Continental Forest Prods., Inc., 805 F.2d 319, 321 (8th Cir.1986) (“The overwhelming weight of authority requires a buyer ... to prove that its seller specifically warranted the product for a defined period of time in the future.”) (applying Nebraska law); R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818, 823 (8th Cir.1983) (“[T]he terms of the warranty must unambiguously indicate that the manufacturer is warranting the future performance of the goods for a specified period of time.”) (applying Missouri law). While never having addressed the precise issues raised in this case, the Minnesota courts appear to follow the majority of jurisdictions in future-performance warranty cases. See Church of Nativity of Our Lord v. WatPro, Inc., 491 N.W.2d 1, 3 (Minn.1992).
The evidence in this case suggests that PPG made several representations about PILT. By deposition, William and Jake Marvin testified about statements made by Bob Panchot, a PPG executive, in 1984. The Marvins’ testimony, which we must accept as true for summary judgment purposes, see Carter v. Chrysler Corp., 173 F.3d 693, 696 (8th Cir.1999), alleges that Panchot made statements about PILT’s long-term effectiveness. Specifically, Jake Marvin’s testimony asserts that Panchot said, among other things: “[PILT] will out last that [P]enta. It will out last the windows that you [William Marvin] have in *880 your home at 26 years. It’s a better product.” Report & Recommendation of August 6, 1998 (“R & R”) at 108. William Marvin’s testimony is somewhat different, but also asserts that Panchot favorably compared PILT’s performance to Penta’s twenty-plus years of success in protecting the windows on the Marvins’ home. See R & R at 107-08. Marvin also points to other statements by PPG representatives that PILT was comparable or superior in performance to Penta as well as to statements touting PILT’s effectiveness at preventing wood rot and similar matters.
The District Court held that, as a matter of law, none of these representations would constitute a warranty explicitly extending to future performance. See Marvin Lumber & Cedar Co., 34 F.Supp.2d at 753. With regard to descriptions of PILT’s positive qualities, such as statements that PILT prevents wood rot or is a “better product” than Penta, the District Court concluded that such descriptions were inadequate because they did not explicitly refer to the future. See id. With regard to the comparison to Penta’s longevity, the Magistrate Judge noted that, based on the record, “the expected life of millwork, which had been treated with Penta, was anywhere from twenty to fifty years.” R & R at 109. The District Court, following the Magistrate Judge, concluded that Panchot’s alleged statement that PILT would outlast Penta was thus too “imprecise” to constitute a warranty explicitly extending to future performance. Marvin Lumber & Cedar Co., 34 F.Supp.2d at 753.
The District Court was undoubtedly correct that PPG’s general representations about PILT do not constitute warranties extending to future performance. Most of the alleged statements do not specifically refer to the future at all. Thus, for. example, a representation that PILT was a “better” product than Penta, besides being unenforceable puffery, see Ruffin v. Shaw Indus., Inc., 149 F.3d 294, 302 (4th Cir.1998), is also merely a description of the present qualities of the good. Thus, any action for breach of warranty based on these representations is long expired.
But two of the representations specifically refer to a future time. Pan-chot allegedly said that products treated with PILT would last as long as products treated with Penta, and he also allegedly said that products treated with PILT would last longer than the windows on the Marvin home, which had been treated with Penta and already had lasted twenty-six years. The District Court appeared to recognize that these statements explicitly refer to the future performance of the goods, but held that they were insufficient to alter the applicable accrual rule because there was no “explicit length of warranty.” Marvin Lumber & Cedar Co., 34 F.Supp.2d at 753. The District Court also quoted the Magistrate Judge’s finding that the performance of Penta was too “imprecise [a] benchmark.” Id.
PPG appears to argue that a warranty of future performance can be valid only if its length is stated in a number of years. The only statutory support for such a contention, the requirement that a warranty “explicitly extend to future performance,” cannot bear the weight that such an interpretation places upon it. A warranty may obviously extend to the future performance of a product, even if the length of warranty coverage is imprecise. A warranty for the “lifetime” of a product, for example, is enforceable as a future performance warranty. See Providence Village Townhouse Condominium Ass’n v. Amurcon-Loudoun Corp., 24 U.C.C.Rep.Serv.2d 864, 870 (Va. Cir. Ct.1994) (“plywood would last for the life of the roof’); Rempe v. General Elec. Co., 28 Conn.Supp. 160, 254 A.2d 577, 578 (1969) (disposal unit “would work properly during its lifetime”); 1 James J. White & Robert S. Summers, Uniform Commercial Code § 11-9, at 608-09 (4th ed.1995); see also Economy Housing Co., 805 F.2d at 321 (characterizing reference to “lifetime” of house as “explicit *881 reference to a future time period”). Obviously, there may be a fact question about how long the relevant “lifetime” may be, but this imprecision cannot mean that a lifetime warranty does not explicitly extend to the future. See Rempe, 254 A.2d at 579 (“What, if her claim is found proven, ‘lifetime’ means concretely, in terms of years or some other unit of time, will have to await a future determination.”). Likewise, in this case, there may be a question about how long products treated with Pen-ta last, but that does not mean that Pan-chot’s alleged statement that PILT-treated products would outlast Penta-treated products does not explicitly extend to the future performance of PILT.
We conclude a genuine issue of material fact exists with respect to an explicit warranty of future performance. The existence of such a warranty, however, would not automatically make Marvin’s claim timely. Assuming that a future warranty is present, Marvin’s breach of warranty claim accrued when Marvin learned or should have learned of the breach, see Minn.Stat. § 336.2-725(2), and expires four years thence, see id. § 336.2-725(1). “[T]he statute of limitations begins to run ‘when the plaintiff discovers or should have discovered the defendant’s refusal or inability to maintain the goods as warranted’ ” WatPro, 491 N.W.2d at 6 (quoting Smith v. Union Supply Co., 675 P.2d 333, 335 (Colo.Ct.App.1983)); accord Anderson v. Crestliner, Inc., 564 N.W.2d 218, 223 (Minn.Ct.App.1997) (holding that breach occurred when seller told buyer that seller would do no more to rectify alleged warranty violation). There is evidence in the record that Marvin knew of some wood rot problems in 1990. The evidence also reflects that Marvin and PPG discussed the rot problems and, ultimately, in 1993, PPG gave Marvin a “formal” response to Marvin’s requests for assistance. Based on this evidence, we conclude there is at least a jury question as to whether or not Marvin’s future performance warranty claims are timely.
PPG argues for affirmance of the District Court’s decision on an alternate ground — that PPG expressly disclaimed warranties for rot. The Magistrate Judge’s Report and Recommendation noted that “the only written warranties between Marvin[ ] and PPG, which are evidenced in the Record, are a pair of warranties for topcoats and finishes.” R & R at 106 n. 31. These documents warrant against “film integrity failures,” such as “cracking, peeling, [and] flaking.” This “film integrity” coverage excludes “cracking of the finish due to substrate failure or movement”; the Magistrate Judge characterized this exclusion as “expressly disclaiming] any warranties against rot.” R & R at 106 n. 31. Neither the Magistrate Judge’s Report and Recommendation nor the District Court’s opinion addressed any argument by PPG that the alleged statements by Panchot, even if true, were legally inoperable because they conflicted with a written disclaimer of warranties. Even if the sales brochure pointed to by PPG constituted a disclaimer of all rot warranties regarding PILT, which is far from clear on the record before us, Minnesota law charges the courts with construing express warranties and disclaimers as consistent wherever reasonable. See Minn.Stat. § 336.2-316. Moreover, PPG does not point to an integration clause in the written document that might extinguish the operation of an oral express warranty as inconsistent with the written disclaimer. See St. Croix Printing Equip., Inc. v. Rockwell Int’l Corp., 428 N.W.2d 877, 880-81 (Minn.Ct.App.1988). We leave the matter for the District Court’s consideration in the first instance. We reject PPG’s hyper-technical argument that Marvin waived its right to challenge the Magistrate Judge’s “factual conclusion,” contained in a footnote discussing an entirely different issue.
We reiterate that the vast majority of Marvin’s contract claims are barred by the statute of limitations. We conclude that *882 fact questions exist as to the existence of a warranty of future performance, as well as to whether Marvin’s claims of breach of that warranty are timely. All the other warranty claims, including breaches of other express warranties, accrued upon tender of delivery and expired four years later, well before the filing of this lawsuit, and summary judgment was properly granted to PPG on those claims.
III.
We turn to Marvin’s tort claims. The District Court determined that Minnesota’s economic loss doctrine bars all of Marvin’s tort claims. The doctrine precludes a commercial purchaser of a product from recovering economic damages through at least some tort actions against the manufacturer or seller of the product. See Superwood Corp. v. Siempelkamp Corp., 311 N.W.2d 159, 162 (Minn.1981), see also Hapka v. Paquin Farms, 458 N.W.2d 683, 688 (Minn.1990) (abandoning Superwood’s exception for damage to “other goods” as between commercial parties). The doctrine was judicially created to protect the integrity of the U.C.C. bargaining process; it prevents tort law from altering the allocation of costs and risks negotiated by the parties. See Superwood, 311 N.W.2d at 161-62. Marvin advances two arguments. First, Marvin questions whether this is a commercial transaction within the meaning of the economic loss doctrine. Second, Marvin asserts that the economic loss doctrine does not apply to intentional fraud and misrepresentation.
A.
The common law of Minnesota governs the interplay between Marvin’s tort claims, the U.C.C., and the economic loss doctrine. The relevant transactions took place between 1985 and 1988. The theretofore-common-law economic loss doctrine was not touched upon by the Minnesota legislature until 1991. See Minn.Stat. § 604.10. There is no statutory indication that the 1991 enactment was intended to apply retroactively. The Minnesota Supreme Court has explicitly left the question of the statute’s retroactivity open. See Lloyd F. Smith Co. v. Den-Tal-Ez, Inc., 491 N.W.2d 11, 17 n. 7 (Minn.1992). That would, of course, be a question of state law, unless retroactive application transgressed constitutional boundaries. Given the presumption of non-retroactivity, it is most likely that the Minnesota Supreme Court would not apply the statute retroactively. See Ubel v. State, 547 N.W.2d 366, 369 (Minn.1996); see also Minn.Stat. § 645.21 (“No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature.”). Therefore, the statutory terms are not relevant and the common-law doctrine governs. The District Court made the same determination. See Marvin Lumber & Cedar Co., 34 F.Supp.2d at 742-44.
After the District Court had already dismissed Marvin’s fraud claims, Marvin persuaded the Minnesota legislature to amend its statutory law in April 1998. The amendment reads as follows: “This section shall not be interpreted to bar tort causes of action based upon fraud or on fraudulent or intentional misrepresentation or limit remedies for those actions.” Minn. Stat. § 604.10(e). The amendment is explicitly retroactive to all actions pending or filed after the date of enactment. We agree with the District Court, however, that since the 1998 amendment only purports to control the interpretation of the statutory version of the economic loss doctrine, it does not apply to this case, which is governed exclusively by the prestatutory common law. While this case was on appeal, the Minnesota legislature again amended its statutory law. The statute now allows common-law misrepresentation claims between merchants so long as “the misrepresentation was made intentionally or recklessly.” 2000 Minn.Laws ch. 358 (to be codified at Minn.Stat. § 604.10). This amendment, by its terms, is applicable only to transactions consummated after *883 August 1, 2000. See id. ch. 358, sec. 1, subdiv. 6.
B.
The economic loss doctrine is broadest in its application to commercial transactions, as opposed to consumer transactions. See Hapka, 458 N.W.2d at 688. A transaction is commercial when the product is sold by “a merchant dealing with another merchant in goods of the kind.” Lloyd F. Smith Co., 491 N.W.2d at 15. In Regents of Univ. of Minn. v. Chief Indus., Inc., 106 F.3d 1409 (8th Cir.1997), we recently analyzed the Minnesota law on the subject. The University of Minnesota had purchased a grain drying unit from Chief Industries, and the unit allegedly failed and started a fire. After analyzing the Minnesota case law and Minn.Stat. § 336.2-104(1), we concluded that “[a] party is thus a ‘merchant’ of goods for purposes of the U.C.C. either: (1) by dealing in those goods; or (2) by way of specialized knowledge of the goods.” Id. at 1411. Because the University had specialized knowledge in grain dryers, including having hired a leading expert as a consultant for the transaction, the University was a merchant with respect to grain dryers, and therefore the economic loss doctrine applied. See id. at 1412. Judge Lay dissented, arguing for a narrower interpretation of “merchant in goods of the kind” that included only dealers in the goods at issue. See id. at 1413-15.
Following the majority in Chief Industries, the District Court determined that Marvin is a merchant with respect to window coatings. The Magistrate Judge recommended rejecting Marvin’s “attempt to don the raiment of naive novitiates.” R & R at 78. The District Court agreed, noting Marvin’s bargaining strength, its long history of purchasing window treatments, and its activity with an industry standard-setting organization as strong evidence of the specialized knowledge requiring this conclusion. See Marvin Lumber & Cedar Co., 34 F.Supp.2d at 748.
Marvin argues that we should abandon Chief Industries. In the recent Jennie-O Foods, Inc. v. Safe-Glo Prods. Corp., 582 N.W.2d 576, 578-79 (Minn.Ct.App.1998), the Minnesota Court of Appeals, as they are free to do, rejected the Chief Industries majority and instead followed Judge Lay’s dissent. Concluding that Minn.Stat. § 336.2-104(1) does not supply a definition of “merchant of goods of the kind,” the Jennie-0 court found that a turkey farm operation was not a merchant with respect to heaters used in its brooding barns; the farm operation was clearly not a dealer in heaters. While we are loath to reject the considered judgment of a prior panel decision of our court, our task is to apply state law, and while decisions of the “various intermediate appellate courts are not [binding on us], ... they are persuasive authority, and we must follow them when they are the best evidence of what [state] law is.” Garnac Grain Co. v. Blackley, 932 F.2d 1563, 1570 (8th Cir.1991); accord Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) (stating that intermediate state court decisions should be followed “unless [the federal court] is convinced by other persuasive data that the highest court of the state would decide otherwise”). Obviously, the opinions of reasonable jurists differ on the scope of “merchant of goods of the kind,” making any prediction of the Minnesota Supreme Court’s ultimate view of the matter uncertain. In this case, because Marvin qualifies as a merchant of goods of the kind even under the more favorable standard in Jennie-O, we need not decide whether Jennie-0 requires us to reject Chief Industries.
Marvin deals in wood preservatives. Marvin sells custom windows and doors made of wood, and one component of that woodwork is a wood preservative to ensure that the windows and doors are long-lasting, Marvin bought PILT and applied it to windows, which Marvin sold. Marvin’s specialized knowledge, discussed by the *884 District Court, combined with Marvin’s sales of a product containing the very good that it bought from PPG, convinces us that Marvin is a dealer in PILT within the meaning of the economic loss doctrine consistent with the narrower definition set out in Jennie-0 and Judge Lay’s Chief Industries dissent to the extent they interpret the common law of Minnesota. If the definition of dealer were so narrow as to include only purchasers who resold a product unaltered, like a broker or distributor, the economic loss doctrine would be nearly meaningless. Marvin has little in common with the turkey farm in Jennie-O, which bought a heater, or the hypothetical businessman in Judge Lay’s dissent, see Chief Industries, 106 F.3d at 1415 n. 5, who regularly buys computers for use in his office. Those individuals are consumers with respect to those goods; a turkey farm is not in the heater business, nor is the hypothetical businessman in the computer business. Thus, if those goods fail, the buyers may seek consumer remedies. Marvin, by contrast, is in the business of selling treated wood products. Where a manufacturer with sophisticated knowledge of a component purchases and incorporates that component into its product, the manufacturer is a not merely a dealer with respect to finished product, but with respect to the component part as well. Thus, Marvin was a dealer with respect to the transactions here in issue and the eco-r nomic loss doctrine operates to limit Marvin’s claims.
C.
Given the application of the economic loss doctrine, Marvin’s negligence and strict liability claims were properly dismissed. Whether the doctrine also bars fraud and misrepresentation claims, however, is more controversial. For example, six opinions on these questions have -been rendered in the Eastern District of Wisconsin alone, each predicting how the Wisconsin Supreme Court will resolve the issues of whether and how the economic loss doctrine applies to intentional fraud. See Rich Prods. Corp. v. Kemutec, Inc., 66 F.Supp.2d 937, 977-80 (E.D.Wis.1999) (reviewing opinions and concluding that fraud claims are barred); Budgetel Inns, Inc. v. Micros Sys., Inc., 34 F.Supp.2d 720, 722-25 (E.D.Wis.1999) (reviewing opinions and concluding that fraud claims are not barred).
In AKA Distributing Co. v. Whirlpool Corp., 137 F.3d 1083 (8th Cir.1998), a panel of this Court addressed the issue, analyzing Minnesota law. We noted that “countless ... cases illustrate and ... the U.C.C. confirms, the presence of a governing commercial contract neither preempts nor eliminates the need for all fraud claims to which the parties’ dealings may give rise.” Id. at 1086 (citing Minn.Stat. § 336.2-721 (“Remedies for material misrepresentation or fraud include all remedies available under this article for nonfraudulent breach.”)). Therefore, the AKA court struck a balance between the competing considerations by concluding: “We think the Minnesota Supreme Court would resolve the legal issue in this case by holding that, in a suit between merchants, a fraud claim to recover economic losses must be independent of the Article 2 contract or it is precluded by the economic loss doctrine.” Id. at 1087. Actionable claims “must be based on a representation that was outside of or collateral to the contract, such as many claims of fraudulent inducement.” Id. at 1086. The panel applied the rule to the ease before it and concluded that fraud claims arising from an alleged promise that the plaintiff “would be a distributor for a long time” were barred because “duration was a term of the contract, and breach of that term was the basis for [the plaintiffs] time-barred contract claim.” Id. at 1087. By contrast, fraud claims based upon the defendant’s alleged failure to disclose business plans harmful to the plaintiff were “the sort of collateral subject that can support an independent fraud-in-the-inducement claim.” Id. Thus, that fraud claim was not barred by the *885 economic loss doctrine, though it did fail for other reasons.
The reasoning of AKA leads us inexorably to the conclusion that Marvin’s fraud claims are barred. Courts generally agree that fraud in the inducement, necessarily prior to the contract, is independent of the contract and therefore not barred by the economic loss doctrine. A leading Michigan case explains as follows:
Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely — which normally would constitute grounds for invoking the economic loss doctrine — but where in fact the ability of one party to negotiate fair terns and make an informed decision is undermined by the other party’s fraudulent behavior.
Huron Tool & Eng’g Co. v. Precision Consulting Servs., 209 Mich.App. 365, 532 N.W.2d 541, 545 (1995).
This concept, which has been referred to as an exception to the economic loss doctrine, is non-controversial. Indeed, the exception was cited approvingly in AKA, 137 F.3d at 1086. A limitation on this exception, announced by Huron and followed in other courts, is more difficult. The Huron court opined that in cases “where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold,” the economic loss doctrine bars the fraud claims because the fraud claims are substantially redundant with warranty claims. Huron, 532 N.W.2d at 545.
Here, the District Court and the Magistrate Judge used the “quality and character of the goods sold” limitation to find the fraud claims not independent of the contract and accordingly barred. Undoubtedly, all of Marvin’s fraud claims relate to the efficacy of the wood preservative, which is also the subject of Marvin’s warranty claims. Considering that representations or descriptions about goods may become express warranties, see Minn.Stat. § 336.2-313(1), it is clear here that Marvin’s fraud claims concerning representations about PILT are not independent of the contract and therefore were properly dismissed.[1]
Marvin argues that we should reject AKA, as does the State of Minnesota as Amicus Curiae. In this instance, however, there is no strong new evidence indicating the Minnesota Supreme Court would find otherwise. Instead, Marvin can only point to decisions in other jurisdictions. See, e.g., United Int’l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1226-27 (10th Cir.2000) (applying Colorado law); Douglas-Hanson Co. v. BF Goodrich Co., 229 Wis.2d 132, 598 N.W.2d 262, 269 (1999), aff'd by equally divided court, 233 Wis.2d 276, 607 N.W.2d 621 (2000). We also note a recent academic work written by Marvin’s counsel. See Steven C. Tourek et al, Bucking the “Trend”: The Uniform Commercial Code, the Economic Loss Doctrine, and Common Laiu Causes of Action for Fraud and Misrepresentation, 84 Iowa L.Rev. 875 (1999). This is *886 insufficient, however, for us to disregard our decision in AKA, especially when it is in line with other recent authority on the subject. See All-Tech Telecom, Inc. v. Amway Corp., 174 F.3d 862, 866 (7th Cir.1999) (collecting eases).
Two other pieces of data are the recent statutory amendments by the Minnesota legislature. We have determined that the amendments simply do not apply to the conduct relevant here, which is instead governed by the Minnesota common law. Even if inapplicable, Marvin and the State of Minnesota argue, the statutory amendments demonstrate Minnesota’s general policy against fraud and specific policy against expansive application of the economic loss doctrine. They assert that this statutory policy should be considered in applying the common-law economic loss doctrine. See Kampsen v. County of Kandiyohi, 441 N.W.2d 103, 106 (Minn.1989) (“Since time immemorial, in the absence of a statute specifically governing a given issue, common law courts have structured rules to resolve the specific issue before them by analogizing to statutes covering the same general subject matter.”); see also Moragne v. States Marine Lines, Inc., 398 U.S. 375, 390-93, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (relying on inapplicable statutory rules in overruling common-law rule contrary to the policy expressed by the statutes). Here, however, application of textually irrelevant statutes as “policy” would be tantamount to their retroactive application. The law in general, and Minnesota law in particular, strongly disfavors retroactive legislation. See Landgraf v. USI Film Prods., 511 U.S. 244, 264, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); Ubel, 547 N.W.2d at 369. Thus, we doubt that the Minnesota Supreme Court would expand the statutes by giving them more retroactive effect than their text requires.
Similarly, if we were to abandon AKA because of the statutory amendments, it would raise constitutional questions akin to the direct application of the statutes. The Magistrate Judge refused to apply the first statutory amendment because he found it would amount to an unconstitutional impairment of the contractual obligations between Marvin and PPG, relying on evidence that the amendment was passed specifically to benefit Marvin at the expense of out-of-state interests. See R & R at 60-70. If we were to give effect to the statutory amendments by considering them as policy, similar, although more complicated, constitutional issues would be present. Cf. Cross Lake Shooting & Fishing Club v. Louisiana, 224 U.S. 632, 639, 32 S.Ct. 577, 56 L.Ed. 924 (1912) (stating that, while only legislative acts can violate the contract clause, court decisions that “give effect” to legislation may suffice). But see Mariniello v. Shell Oil Co., 511 F.2d 853, 859-60 (3d Cir.1975) (rejecting contract clause claim where New Jersey Supreme Court effectively gave retroactive force to statute by crafting new common-law rule modeled after statute). We avoid the constitutional questions by refusing to give the inapplicable statutes controlling weight. See Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (discussing “deeply rooted” doctrine that courts should avoid constitutional questions unless issue is “unavoidable”).
Alternatively, Marvin attempts to distinguish AKA on the ground that AKA does not apply to sales of goods contracts under Article 2 of U.C.C. The AKA court, true, did note that the contract at issue was “a different type of Article 2 contract,” AKA, 137 F.3d at 1086 n. 3; this distinction was important in determining whether to apply the common-law or statutory version of Minnesota’s economic loss doctrine. AKA applied the common-law version, as we do here. Marvin simply offers no reason why the kind of contract at issue in AKA should be treated differently under the common law than the kind of contract at issue in this case. Without a meaningful factual distinction, AKA controls.
*887 In addition to asserting fraudulent concealment as a tolling mechanism, Marvin also pleaded fraudulent concealment as an independent tort. We have previously concluded that Marvin lacks proof of fraudulent concealment as a tolling mechanism. Marvin likewise lacks proof to make out a tort claim, and in any event, this tort claim is indistinguishable from Marvin’s general fraud claim and is essentially redundant of its warranty claims. We therefore conclude, as did the district court, see Marvin Lumber & Cedar Co., 34 F.Supp.2d at 749 n. 9, that the facts will not support an independent tort in light of the economic loss doctrine. This conclusion is buttressed by Minnesota law, independent of the economic loss doctrine, suggesting that such an independent fraudulent concealment claim will not lie where the fraudulent concealment relates to a promisor’s duties under the contract. See Cherne Contracting Corp. v. Wausau Ins. Cos., 572 N.W.2d 339, 345 n. 2 (Minn.Ct.App.1997).
IV.
We finally address Marvin’s statutory claims. Marvin seeks redress under three Minnesota statutes, Minn.Stat. §§ 325D.13, 325F.67, and 325F.69, as well as statutory claims based on Tennessee law.
In the circumstances of this case, the Minnesota consumer protection statutes do not apply to a merchant such as Marvin. The Minnesota Supreme Court addressed a similar situation in WatPro, 491 N.W.2d 1. In examining how consumer protection statutes can co-exist with the U.C.C., the court drew a sharp distinction between commercial parties and consumers. See id. at 7. Because the plaintiff church was not a “sophisticated merchant” with respect to the purchase in question, the court concluded that “[t]he transaction at issue here is an ordinary consumer transaction within the scope of state statutes regulating sales to consumers.” Id. at 8. Since the WatPro court had a claim under Minn.Stat. § 325F .69 before it, our conclusion that Marvin is a merchant with respect to window treatments quickly disposes of Marvin’s claim under that statute. See also Ly v. Nystrom, 602 N.W.2d 644, 647 (Minn.Ct.App.1999) (holding that § 325F.69 does not protect merchants).
The language and reasoning of WatPro also clearly sweep broadly enough to apply to a related Minnesota statute relied upon by Marvin. The statute, Minn.Stat. § 325D.13, part of the Unlawful Trade Practices Act, is similarly designed to protect consumers. See MinmStat. § 325D.09 (“The legislature of the state of Minnesota hereby finds: that the trade practices defined and prohibited by sections 325D.09 to 325D.16 ... mislead consumers as to the quality, ingredients and origin of merchandise purchased....”). Thus, the holdings of WatPro and Nystrom teach that § 325D.13 does not apply to protect Marvin in the circumstances of the transactions involved in this case.
The third statute, MinmStat. § 325F.67, essentially proscribes false advertising. Prior to WatPro, the Minnesota Court of Appeals addressed the question of whether or not the statute applied where a commercial farm bought a grain silo on the basis of false advertisements. The defendants argued that the statute only applied to consumers. See Kronebusch v. MVBA Harvestore Sys., 488 N.W.2d 490, 494 (Minn.Ct.App.1992). Concluding that the statute was “silent” on that issue, the Kro-nebusch court nevertheless concluded that the statute “applies to the farmers as purchasers of silos.” Id. at 494-95.
We ultimately believe, however, that the Minnesota Supreme Court would find that MinmStat. § 325F.67 does not apply to a merchant such as Marvin, for several reasons. First and foremost, Kronebusch was decided without the benefit of WatPro, which significantly undercuts its predictive value. Second, the facts of Kronebusch did not present the precise issue before us; the plaintiff, while a commercial farmer, *888 was not described as a sophisticated merchant with respect to grain silos. The defendant appeared to argue that all commercial enterprises (i.e., all businesses) should be outside the protections of the statute. Third, it is clear that Minnesota’s false advertising statute is primarily designed to protect consumers, not sophisticated merchants. Indeed, Minnesota’s highest court recently described all three of the Minnesota statutes at issue in this case, including § 325F.67, noting that they “are generally very broadly construed to enhance consumer protection.” State by Humphrey v. Philip Morris, Inc., 551 N.W.2d 490, 496 (Minn.1996). Thus, the reasoning of WatPro applies as much to § 325F.67 as it does to § 325F.69. Fourth, and finally, the only post-WdiPro decision of the Minnesota courts to address the issue, albeit in an unpublished opinion, agrees. See Huntting Elevator Co. v. Biwer, No. C9-98-548, 1998 WL 747170 (Minn.Ct.App. Oct.27, 1998). Thus, we have little doubt that the Minnesota Supreme Court would reach the same conclusion.
The District Court, therefore, properly dismissed all the Minnesota statutory claims. The Philip Morris case does not stand for any contrary proposition. There, the court allowed Blue Cross to pursue claims that clients of Blue Cross, consumers of cigarettes, were defrauded by the defendant cigarette manufacturers, to the detriment of Blue Cross. See Philip Morris, 551 N.W.2d at 496. Here, Marvin points to no evidence that PPG made any misrepresentation to any consumer. Moreover, Philip Morris is a case about standing, while WatPro concerns the substantive reach of the consumer protection statutes in light of tension with the U.C.C. See WatPro, 491 N.W.2d at 7-8; see also id. at 9 (Simonett, J., concurring in relevant part) (explaining how majority opinion is interpreting statutory language).
The District Court dismissed Marvin’s statutory claims under Tennessee law based on that state’s four-year statute of repose. See Marvin Lumber & Cedar Co., 34 F.Supp.2d at 755 (citing Tenn.Stat. § 47-18-110). Marvin only argues that the claims are timely because fraudulent concealment operated to toll the ticking clock. Given our conclusion that no fact question exists as to the fraudulent concealment of Marvin’s contract claims, Marvin’s Tennessee statutory claims are clearly barred.
V.
This is a fact-intensive case involving murky areas of state law. We commend the thorough and thoughtful analysis of the several District Court and Magistrate Judges. We affirm the District Court with respect to counts (I) and (III) — (XIII). We reverse, however, with respect to count (II), Marvin’s express warranty claim, concluding that fact questions exist as to whether a warranty of future performance was made to Marvin by PPG and as to whether that claim is timely.

. The dissent’s argument that Marvin’s fraud claims are independent of the contract is somewhat astonishing. Ultimately, Marvin’s fraud claims all revolve around one central allegation: PPG mislead Marvin into believing that PILT would be an effective product, but PILT failed. The only harms alleged arose from PILT’s inefficacy, not, for example, from PILT’s difficulties with certification. As the dissent recognizes, commercial parties may protect themselves against the risk of product failure by securing warranties. Moreover, as we have pointed out, PPG's alleged representations may have created express warranties pursuant to Minnesota law. and, if so, the warranties became terms of the contract between Marvin and PPG. Indeed, Marvin's complaint alleges the breach of express warranties based on the same vast array of representations that make up its fraud claims. As Part II explains, however, because Marvin waited too long to file suit, most of those warranty claims are now time-barred. Marvin may yet have a winning warranty-of-future-performance claim, but to allow Marvin to resurrect its other expired warranty claims through tort would be precisely the kind of subversion of the U.C.C. that the economic loss doctrine is intended to prevent.