# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-2833

_____

Marvin Lumber and Cedar Company;     *
Marvin Windows of Tennessee, Inc.,     *
                                       *
        Plaintiffs - Appellees,        *
                                       *
v.                                     *
                                       *  Appeals from the United States
PPG Industries, Inc.,                  *  District Court for the
                                       *  District of Minnesota.
        Defendant - Appellant.         *
                                       *
-----------------------------------    *
                                       *
American Chemistry Council,            *
                                       *
        Amicus on Behalf of Appellant. *

_____

No. 02-2869

_____

Marvin Lumber and Cedar Company;     *
Marvin Windows of Tennessee, Inc.,     *
                                       *
        Plaintiffs - Appellants,       *
                                       *
v.                                     *
                                       *
PPG Industries, Inc.,                  *
                                       *
        Defendant - Appellee.          *

_____

Submitted:  June 9, 2003
Filed:  March 23, 2005
_____

Before BYE, BOWMAN, and BEAM, Circuit Judges.
_____

BOWMAN, Circuit Judge.

PPG Industries, Inc., appeals from the judgment entered in favor of Marvin Lumber and Cedar Company and Marvin Windows of Tennessee, Inc. (collectively, Marvin), on Marvin's claim for breach of express warranty of future performance. Marvin cross appeals.  We affirm in part and reverse in part.

I.

This case is before us for the second time.  See Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873 (8th Cir. 2000).  As we explained in our first opinion, Marvin is a family-owned company that manufactures, among other things, millwork products—wooden doors and windows.  PPG sells wood preservatives and coatings.  The genesis of this lawsuit was Marvin's use, from 1985 to 1988, of PPG's wood treatment PILT (preservative in-line treatment) on Marvin's doors and windows.  PILT replaced the industry standard in wood preservatives, products containing pentachlorophenol (Penta).  Marvin had used Penta products successfully for years until environmental concerns were raised about the active ingredient.

In 1994, Marvin filed this diversity suit seeking damages on a number of legal theories, claiming that PILT had failed to prevent premature rot and decay in Marvin's wood products.  The district court dismissed or granted summary judgment to PPG on all counts.  On appeal, we affirmed in large part.  But we remanded for trial

Marvin's claim for breach of an express warranty of future performance, having concluded that there remained genuine issues of material fact on the claim. The warranty arose, Marvin said, from representations by PPG to Marvin employees that wood products treated with PILT would last as long or longer than Penta-treated products. See id. at 879–80.

On remand, at the request of PPG, the four-month jury trial was bifurcated. In part one, the jury found that PPG had given Marvin a warranty of future performance and that such warranty formed part of the basis of the bargain between the parties and was incorporated into their agreement. In the second phase, the jury found the warranty was breached and awarded damages: $53.6 million for out-of-pocket costs, $25.2 million for past lost profits; $27 million for future lost profits; and $30 million for loss of goodwill. The District Court entered judgment for Marvin, awarding $156,118,625.92 for damages (including third-party litigation costs) with interest (not including post-judgment interest). PPG appeals and Marvin cross appeals. We address the issues in the order presented.

II.

For its first issue on appeal, PPG contends that the District Court erred when it granted judgment as a matter of law (JAML) in favor of Marvin on the question of notice.[1] Under Minnesota law, after acceptance of goods, a "buyer must within a reasonable time after the buyer discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Minn. Stat. § 336.2-607(3)(a)

---

[1]In the part of the trial transcript where Marvin's motion was argued and throughout the briefs, the parties repeatedly refer to the decision as a "directed verdict." That was a term of art in federal civil practice that has been abandoned. Fed. R. Civ. P. 50 advisory committee notes, 1991 Amendment, subd. (a).

(2002).[2] We review de novo the District Court's decision to grant JAML to Marvin, applying the same standard as the District Court, that is, Rule 50(a) of the Federal Rules of Civil Procedure. Arabian Agric. Servs. Co. v. Chief Indus., Inc., 309 F.3d 479, 482 (8th Cir. 2002). The question for us is: PPG having been "fully heard" on the issue of notice, was there a "legally sufficient evidentiary basis for a reasonable jury to find for" PPG so that granting JAML in Marvin's favor was error? Id. (quoting Fed. R. Civ. P. 50(a)(1)).

PPG claims that Marvin had discovered or should have discovered the breach no later than 1990; that the notice finally given to PPG in April 1993 was inadequate; and that adequate notice was not given until September 1997. According to PPG, whether the notice was given in 1993 or 1997, it was not, as a matter of law, given "within a reasonable time," and so Marvin is not entitled to any remedy for breach. PPG asks that we order judgment for PPG on the question of notice or at the very least remand for a new trial so the issue can be decided by a jury.

Initially, PPG asserts in its brief that "this Court held in *Marvin I* that a reasonable jury could find that Marvin discovered or should have discovered its claim for breach" in early 1990, suggesting that our comment foreclosed JAML on the question of notice. Brief of Appellant at 23. We did note that fact questions existed on the issue of when Marvin knew or should have known of the breach for purposes of a statute of limitations issue—was suit filed within four years of the time when the alleged breach was known or should have been known?[3] But the District Court's

---

[2]This provision is found in the Uniform Commercial Code or U.C.C., which Minnesota has adopted. In this opinion, as a kind of shorthand, we may refer in text to the U.C.C. section numbers instead of the Minnesota Statutes section numbers, for example, § 2-607 instead of § 336.2-607.

[3]Indeed, on remand that question was submitted to the jury in phase two of the trial, and the jury found that PPG had not proved by a preponderance of the evidence that Marvin knew or should have known of the breach before April 22, 1990, four

conclusion as a matter of law that Marvin gave reasonable notice of breach to PPG is not in any way inconsistent with our determination in <u>Marvin I</u>, on the record before the Court at that time, that a jury could find Marvin knew or should have known of the problems with PILT before April 1990. The language from <u>Marvin I</u> noting that fact questions made summary judgment inappropriate on the statute of limitations question on the record before us **in that case** does not preclude JAML on the notice issue on the record before us now. The District Court's decision on notice followed a full-blown trial. Marvin, no doubt having read our opinion in <u>Marvin I</u> as carefully as did PPG, presumably worked to tighten up its evidence in hopes of winning a jury verdict—or better yet, JAML—on the question of notice.

It is true that the sufficiency of notice under § 2-607 ordinarily is a question of fact to be determined by a jury. <u>Church of the Nativity of Our Lord v. WatPro, Inc.</u>, 491 N.W.2d 1, 5 (Minn. 1992), <u>overruled on other grounds</u>, <u>Ly v. Nystrom</u>, 615 N.W.2d 302 (Minn. 2000). But if, as the District Court decided, "no reasonable jury could have determined" that Marvin failed to give the requisite notice, it was not error for that court to decide the issue and enter judgment as a matter of law in favor of Marvin on the issue. Order and Memorandum of June 7, 2002, at 3. We now look at the evidence before the court on the question of notice.

Under § 2-607, Marvin's duty to give notice to PPG arose when Marvin discovered or should have discovered the breach—by early 1990, according to PPG. Marvin's position is that it was unaware of the breach until just before it gave PPG notice in April 1993. The undisputed evidence at trial showed that Marvin indeed had some concerns about wood deterioration before 1993 but that company employees did not know that the rot problems correlated with the switch to PILT until 1993. Moreover, given the representations about PILT's superior ability to prevent rot, it was reasonable that Marvin did not come quickly to the realization that the wood

years before suit was filed.

preservative might be the cause of the problem until it had explored and ruled out other potential causes—which it had done by 1993. Marvin's duty under the "should have known" standard, once it became aware of excessive rot problems, was to investigate further and determine whether PILT was the problem. This it did.

But PPG cites evidence in the record from which, it says, a reasonable jury would have found (or at the very least, could have found) that Marvin knew or should have known about the breach of warranty by early 1990. First, PPG identifies a Marvin document dated December 12, 1989, that lists thirty-five "anticipated concern[s]," among which is number twenty-nine, "wood rotting complaints," with "wood treatment systems" under the corresponding "comment." Defendant's Exhibit 624. But the document does not indicate that complaints were escalating or that they were primarily in the newer, PILT-treated products. And as we have learned from our review of the trial transcript, wood treatment "systems" would refer not only to the preservative pretreatment, but also to coatings that go on top of the treated wood (e.g., paint) and the method by which the pretreatment and the coatings are applied. In other words, a reasonable jury could not have found that the Marvin employees who saw this document knew or should have known—because of the content of this document—that PILT had failed to live up to PPG's promises regarding its future performance.

PPG also brings to this Court's attention Marvin's "Wood Deterioration Project" of 1990. Defendant's Exhibit 1576. Significantly, the bulk of the report lists the specific millwork products about which complaints had been received and the location of the deterioration within those products. Exterior finish is noted, but type of pretreatment is not. Instead, PPG suggests that Marvin should have known PILT was the problem because the report noted that of the 554 windows and doors with reported deterioration problems, 139 of the units reported upon were manufactured from 1985 to 1988, during which time Marvin was using PILT. But the Wood Deterioration Project is simply a report of raw numbers; no statistical analysis

accompanied the project. For example, the numbers do not reflect the actual percentage of production for a given year that was affected with deterioration problems. In truth, the most dramatic correlation, if there is one, is between deterioration and geography: 373 of the reports came from the northeast, more than the other three geographical areas combined. No reasonable jury could find from the results of this project that Marvin knew or should have assumed in 1990 that the use of PILT was causing an increase in wood-rot complaints. The report does suggest that additional inquiry might be in order, and as we have said, Marvin undertook a further investigation.

In addition, PPG points to an internal Marvin memorandum from a territory manager to the customer service manager dated September 14, 1990, that notes rotting problems in its products installed in buildings in southern states. Defendant's Exhibit 170. But the memo says that the problems are "due to sash separation, which then leads to a rotting problem." Id. The proposed corrective measures listed in the memo all relate to the joints and attachments of the sashes; there is no indication that a failure of wood pretreatment, whether Penta or PILT (we cannot tell from the memo when the sashes at issue were manufactured), was or should have been suspected as the root cause of the problem. Indeed, the memo references a wholly unrelated cause—sash separation.

Finally, PPG notes a report sent to a PPG employee from a Marvin employee on July 14, 1993, showing that from 1990 through 1992, deterioration complaints about PILT-treated products had outstripped complaints about the older Penta-treated products. Plaintiff's Exhibit 1586. The undisputed testimony, however, was that numerous factors could have contributed to the rot problems. And it was not until a committee of Marvin employees studied the problem in 1992 and 1993 that a determination was made that PILT was the common denominator in the products about which Marvin was receiving complaints.

"In deciding whether the notice requirement has been complied with, the jury must evaluate 'the factual setting of each case and the circumstances of the parties involved.'" WatPro, Inc., 491 N.W.2d at 5 (quoting Wagmeister v. A.H. Robins Co., 382 N.E.2d 23, 25 (Ill. App. Ct. 1978)). We must agree with the District Court that, on these facts, Marvin was entitled to JAML on the issue of § 2-607 notice. Even taken together, the documents upon which PPG relies in its argument are not sufficient to show that Marvin knew or should have known that the wood-rot problems it was experiencing beginning in 1989 through 1992 were the result of pretreatment with PILT, and no reasonable jury could so find. While PPG receives the benefit of all reasonable inferences that may be drawn from the evidence, an inference is not reasonable unless it may be drawn "without resort to speculation." Arabian Agric. Servs. Co., 309 F.3d at 482 (citations to quoted cases omitted). And it would be pure speculation for a jury to conclude that the evidence of rot that Marvin had in its possession in 1990 was such that Marvin knew or should have known that PILT was the singular or even primary culprit. There was no conceivable reason for Marvin **not** to advise PPG as soon as it was confirmed that PILT was the problem. It was in Marvin's best interests to identify the cause, remedy the problem, and seek redress from the responsible party as soon as possible. Shortly after Marvin realized that the pattern of rot complaints it was receiving had only PILT in common, in spite of the promises of superior performance it had received from PPG regarding the wood treatment, it notified PPG—well within a "reasonable" time.

PPG contends that even if we agree with the District Court that Marvin was entitled to JAML because it did not know, nor should it have known, there was a breach of warranty until 1993, the notice given at that time was inadequate because it did not mention specifically the warranty upon which Marvin ultimately prevailed. Marvin did not rely upon an express warranty of future performance for recovery of damages from PPG until it amended its complaint to add the claim in 1997. The 1993 notice therefore failed as a matter of law, according to PPG. But "[t]he notice provision is not intended to 'operate as a technical procedural barrier to deny

claimants the opportunity to litigate the case on the merits.'" <u>WatPro</u>, 491 N.W.2d at 5 (quoting <u>Prutch v. Ford Motor Co.</u>, 618 P.2d 657, 661 (Colo. 1980) (en banc)).  We think PPG demands more of the notice than Minnesota law requires.  See <u>State v. Patten</u>, 416 N.W.2d 168, 172 (Minn. Ct. App. 1987) (citing <u>Moosbrugger v. McGraw-Edison Co.</u>, 170 N.W.2d 72, 80 (Minn. 1969)).

On the subject of § 336.2-607 notice and its adequacy, the Minnesota Supreme Court has said that it "need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." <u>WatPro</u>, 491 N.W.2d at 5 (quoting Minn. Stat. Ann. § 336.2-607 U.C.C. cmt. 4 (West 1966)).  Marvin's 1993 notice to PPG did just that, advising PPG that the common factor in the spate of rot complaints it was receiving was wood pretreatment with PILT.  In fact, a December 28, 1993, internal PPG memorandum demonstrates that PPG knew full well that Marvin was claiming warranty, breach, and damages.  That document summarized a December 14, 1993, meeting "Regarding Rot Claims" and described Marvin's position as PPG understood it:  "In 1984 PILT was sold to Marvin as a superior product and better than anything previously used [the warranty].  Now they have rot problems [the breach] and would like PPG to ante up [the damages]." Plaintiff's Exhibit 1664.  As we have said, Marvin had every reason to get notice to PPG as soon as Marvin knew that PILT was the problem.  PPG thus cannot claim "commercial bad faith" on the part of Marvin, so Marvin should not, on the basis of the notice given here, be denied its remedy for breach.  <u>WatPro</u>, 491 N.W.2d at 5 (quoting Minn. Stat. Ann. § 336.2-607 U.C.C. cmt. 4 (West 1966)).

We affirm the District Court's decision to grant JAML to Marvin on the issue of notice.

III.

PPG next argues that the District Court erred when it declined to enforce a term that appeared in the order acknowledgments for PILT that PPG sent to Marvin. That term purports to limit damages to the price Marvin paid PPG for PILT, $1.6 million.

PPG sent Marvin sixty-six acknowledgments of Marvin purchase orders for PILT. On the face of the form acknowledgment, PPG avers that it accepts the order with the understanding that the only terms and conditions to which it consents are set forth in the acknowledgment. Although there is a line for an "authorized signature" just below this statement, none of the acknowledgments is signed anywhere by anyone. On the back of the acknowledgment, in fine print, in the last item under "TERMS AND CONDITIONS," is this language: "In no event shall Seller's liability for damages in respect to products sold hereunder, or otherwise exceed the purchase price attributable to the specific product as to which a claim is made." E.g., Defendant's Exhibit 7. On its face, this disavowal would seem to limit Marvin's damages as PPG claims.

Under Minnesota law and the U.C.C., a written order acknowledgment from one merchant to another that contains terms in addition to those originally agreed upon by the parties will be considered part of the agreement unless:

(a) The offer expressly limits acceptance to the terms of the offer;
(b) [The new terms] materially alter [the agreement]; or
(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Minn. Stat. § 336.2-207(2) (2002). There is no contention here that Marvin's purchase order (its offer) expressly stated that acceptance was limited "to the terms

-10-

of the offer" (subsection (a)) nor that Marvin ever objected to the limitation of damages in the course of its dealings with PPG (subsection (c)). But as for subsection (b), Marvin contends that the damages limitation was a material alteration to the contract for purchase and sale.[4] PPG disagrees, relying on U.C.C. commentary that says "a clause . . . limiting remedy in a reasonable manner" (citing U.C.C. § 2-719) involves "no element of unreasonable surprise" and will become a part of the contract unless an objection is raised. Minn. Stat. Ann. § 336.2-207 U.C.C. cmt. 5 (West 1966). The "unreasonable surprise" is a reference to a previous comment wherein the drafters gave examples of clauses that "would normally 'materially alter' the contract and so result in surprise or hardship if incorporated without express awareness." Id. cmt. 4. Quoting this Circuit and U.C.C. § 2-207 Comment 4, the Minnesota Court of Appeals has said, "An agreement is materially altered if an addition would 'result in surprise or hardship if incorporated without express awareness by the other party.'" TRWL Fin. Establishment v. Select Int'l, Inc., 527 N.W.2d 573, 579 (Minn. Ct. App. 1995) (quoting N & D Fashions, Inc. v. DHJ Indus., Inc., 548 F.2d 722, 726 (8th Cir.

---

[4]Even if an additional term appearing only in an acknowledgment is incorporated into a contract under § 2-207, if it is a limitation "on the measure of damages recoverable," as is the term at issue here, it may not be enforceable. Minn. Stat. § 336.2-719. An "exclusive or limited remedy" will not stand if it "fail[s] of its essential purpose." Id. § 336.2-719(2). Likewise, a limitation on consequential damages will have no effect if it is "unconscionable." Id. § 336.2-719(3). PPG contends that "the district court apparently applied the 'failed of its essential purpose' standard to hold under section 2-719 that the damages limitation was unenforceable." Brief of Appellant at 37. PPG is mistaken. The District Court clearly said that the "damage provision would constitute a material alteration of the contract," applying § 2-207. Order and Memorandum of June 7, 2002, at 5. See Christian v. Sony Corp. of America, 152 F. Supp. 2d 1184, 1189 (D. Minn. 2001), where the same District Court judge demonstrated his understanding of the distinction by actually applying the "failed of its essential purpose" test. Because we hold that the damages limitation never became a part of the contract under § 2-207, we do not consider whether the damages limitation clause at issue here either fails of its essential purpose or is unconscionable under § 2-719.

-11-

1976) (quoting Comment 4 to U.C.C. § 2-207)).[5] Likewise, in applying § 2-207, we have said, "Considerations of surprise and hardship must remain a part of the [material alteration] analysis." Shur-Value Stamps, Inc. v. Phillips Petroleum Co., 50 F.3d 592, 599 (8th Cir. 1995) (applying Texas law); see Johnson v. Murray, 648 N.W.2d 664, 670 (Minn. 2002) ("Uniform laws are interpreted to effect their general purpose to make uniform the laws of those states that enact them. Accordingly, we give great weight to other states' interpretations of a uniform law." (citation omitted)).[6]

------

[5]In N & D Fashions, it was unclear whether the laws of Minnesota, Missouri, or New York applied. The Court determined that it was unnecessary to resolve the question, as each state had "enacted UCC § 2-207 without modification." N & D Fashions, 548 F.2d at 724 n.2.

[6]Although the Minnesota courts and this Court are not among them, there are courts that have read U.C.C. § 2-207 Comments 4 and 5 together to exclude hardship as a factor to be considered in the analysis: that is, material alteration is not defined by hardship (it does not appear in Comment 5); hardship is a consequence of a material alteration (it does appear in Comment 4). The Seventh Circuit, for example, has said that "[h]ardship is a consequence, not a criterion. (Surprise can be either.)" Union Carbide Corp. v. Oscar Mayer Foods Corp., 947 F.2d 1333, 1336 (7th Cir. 1991). At first blush, that seems a fair reading of the comments, given the way they are worded. On the other hand, why would the drafters even mention "hardship" if it were not a factor to be considered in determining materiality? In any event, the comments do not have the force of law, and courts applying Minnesota law have declared that a finding of either surprise **or** hardship will result in a material alteration.

PPG quotes the Union Carbide language in its brief—but in a discussion of unconscionability, again blurring the line between § 2-207 material alteration and § 2-719 unconscionability. Brief of Appellant at 38. The Seventh Circuit's comments clearly apply to an analysis of material alteration under § 2-207—indeed, that court was dealing with an indemnity clause, and § 2-719(3)'s limitation on consequential damages and the unconscionability thereof would have no relevance.

Before we move on to our legal analysis, we must address the matter of our standard of review. The Minnesota Court of Appeals has said that "[w]hether an additional term materially alters an agreement is a question of fact which must be resolved on a case by case basis." TRWL Fin. Establishment, 527 N.W.2d at 579 (citing N & D Fashions, 548 F.2d at 726). In such a case, we would review the District Court's finding of material alteration only for clear error. But the District Court itself concluded that the damages limitation term was a material alteration "as a matter of law." Order & Memorandum of June 7, 2002, at 5. If that is the case, we should review the decision de novo, as PPG acknowledges in its main brief. See Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991) ("[A] court of appeals should review *de novo* a district court's determination of state law."). In its reply brief, PPG cites TRWL for the first time for the proposition that the question of material alteration is one of fact but then makes no effort to clarify our standard of review. Further, PPG does not challenge on appeal the District Court's having usurped the role of the jury, if indeed TRWL is correct. Marvin ignores the standard of review altogether. We decline to sort out the difficulties of ascertaining our standard of review because it is not necessary for us to do so. The result we reach would be the same if we reviewed the decision for clear error as a question of fact or if we applied de novo review as though the decision were a conclusion of law.

The facts of this case concerning material alteration, that is, those which go to prove hardship or surprise, are really without dispute. After considering them, we conclude that enforcement of the damages limitation provision would result in both hardship and surprise to Marvin.

Economically, the hardship to Marvin is clear—the $1.6 million PPG says it owes under the terms of the acknowledgment is a fraction of the out-of-pocket costs to Marvin resulting from PILT's failure, not even considering any consequential damages. Under the terms of the boilerplate limitation, the distribution between Marvin and PPG of risk of the product's failure is dramatically altered, with Marvin

-13-

bearing the brunt of it.  The warranty that the jury found was for future performance.  The failure of the product in the future—after it was applied to the wood and the wood was made into a window and installed in a building—would be, and was, catastrophic in terms of damages.  Given that the warranty was for PILT's future performance, the damages should remedy a failure of that future performance, not just refund the money spent for the product.  Reimbursing the cost of the product—essentially "replacing" the product—would not enforce the warranty that PPG gave to Marvin.  Moreover, most of the damages at issue were unquestionably foreseeable.[7]

As for surprise, the provision was not negotiated by PPG and Marvin.  While it appeared in all the acknowledgments, it was boilerplate language, in small print, on the back side of a form that was dense with other small print.  Cf. TRWL Fin. Establishment, 527 N.W.2d at 579 ("If the forum selection clause is contained in the boilerplate language of a confirmatory memorandum, and is not bargained for, this presumption [that a party adversely affected by the clause has received consideration at the time of contracting] is untenable.").  Marvin witnesses testified concerning their surprise that a damages limitation clause may have become part of the contract with PPG.  While this testimony is self-serving, it was uncontradicted and not without support elsewhere in the record.  Marvin also proffered evidence that PPG and other coatings manufacturers had always made things right when a product of theirs failed with consequences, not just refunding the purchase price of the product sold but replacing the Marvin product that was damaged as a result of the failure.  Granted, the catastrophic nature of PILT's failure was new to the relationship between PPG and

---

[7]We recognize the similarity of what we say here to an application of the "fails of its essential purpose" test of § 2-719.  See supra n.4.  Nevertheless, we are aware of the distinction between the two tests.  We are simply saying here that catastrophic failure of PILT, with the distribution of risk shifted dramatically to Marvin by the form acknowledgment, is a significant hardship to Marvin.

Marvin, but that would be all the more reason that PPG's refusal to pay consequential damages would be both a surprise and a hardship.

We have said that "Uniform Commercial Code remedies should be liberally administered." Soo Line R.R. v. Fruehauf Corp., 547 F.2d 1365, 1373 (8th Cir. 1977) (applying Minnesota's § 2-719). It is true that Comment 5 to U.C.C. § 2-207 lists "a clause . . . limiting remedy in a reasonable manner" as one that will "involve no element of unreasonable surprise" and therefore will "be incorporated in the contract." Apart from the fact that the commentary does not have the force of law, we conclude on the facts of this case that the provision in reality did involve "an element of unreasonable surprise" to Marvin. The damages limitation language from the PPG acknowledgment forms therefore did not become a part of the contract between PPG and Marvin and is not enforceable.

## IV.

For its next issue, PPG challenges the awards to Marvin of goodwill damages ($30 million) and damages for past and future lost profits ($25.2 million and $27 million, respectively).

## A.

In arguing that the damages for lost goodwill should be vacated, PPG raises three points: the evidence was insufficient to sustain the award, the award duplicated the damages for future lost profits, and the claim was submitted to the jury without proper notice to PPG. We are somewhat troubled by the short notice given to PPG that Marvin was seeking damages specifically for lost goodwill and that the claim would be submitted to the jury in addition to a claim for future lost profits. But we reverse because we determine that the record cannot support awards for both $30 million in lost goodwill and $27 million for future lost profits. The fact is, the

-15-

evidence supporting an award of goodwill damages to which Marvin directs our attention is the very same evidence used to support an award of damages for future lost profits. We conclude that this evidence warranted an instruction on, and ultimately an award of, damages for future lost profits, as we will explain, but not an instruction on (or an award of) damages for lost goodwill in addition.

We review de novo the District Court's decision to submit an instruction on lost goodwill. Porous Media Corp. v. Midland Brake, Inc., 220 F.3d 954, 961 (8th Cir. 2000). Because we conclude that the court erred in giving the instruction, we will not consider sufficiency of the evidence per se. Nonetheless, our analysis will entail a review of the evidence that Marvin claims supports the award. See C.L. Maddox, Inc. v. Benham Group, Inc., 88 F.3d 592, 601, 602 (8th Cir. 1996) (noting that certainty of damages and sufficiency of evidence are "very closely related issues" but "analytically distinct").

Marvin presented evidence of the importance to a wooden window and door manufacturer of a good reputation among distributors, builders, homeowners, and others. The undisputed testimony was that damage to reputation would be a serious problem. Before the problems with PILT, Marvin had an excellent reputation in the industry. But when the volume of rot problems became so great that Marvin was unable to continue to replace windows and repair incidental damage that resulted from the deteriorated millwork, customers became "quite hostile," even threatening lawsuits, according to Gary Daniels, a Marvin employee who handled PILT-related complaints. Transcript at 5223. President Susan Marvin testified to spending "hours on the phone with customers who are so angry and so distressed." Id. at 7333. Susan attributed stagnant growth at Marvin after the PILT problems "to homeowners telling friends and neighbors and associates that the product isn't good." Id. at 7462. She said, "Our reputation has been seriously damaged. And we have lost a lot of loyal customers." Id. As for specifics, Susan testified that an institutional customer, having become aware of the problems others were having with Marvin millwork

-16-

products, required Marvin to purchase a performance bond before the customer would proceed with a project, already underway, to replace existing windows with Marvin windows.

On the basis of this evidence, the jury was instructed that it could consider whether Marvin "suffered any measurable loss to its goodwill" and award damages for such loss. Id. at 10846. The court instructed the jury that "[t]he measure of Marvin's damage is the difference between such goodwill before and after its experience with wood rot." Id. at 10847. The problem we see with Marvin's claim is in the quantification of goodwill damages, translating angry or cautious customers into dollars and cents. While we are not suggesting that mathematical certainty is required, the jury's decision that Marvin suffered a $30 million loss of goodwill was conjecture. Marvin does not—indeed, it cannot—point to any evidence in the record separate and apart from its evidence of future lost profits to support an award of $30 million in lost goodwill.[8] Marvin's trial counsel admitted as much, suggesting to the jury that goodwill damages are "something that you just have to go into your tummy and get." Id. at 10814. It was goodwill, not the damages for a loss thereof, that was described for the jury as an "intangible business value." Id. at 10846. The damages

_____

[8]In concluding that the award of damages for lost goodwill should be affirmed, Judge Bye relies upon our decision in Porous Media Corp. v. Pall Corp., 173 F.3d 1109 (8th Cir. 1999), opining that "the quality and quantity of evidence presented by Marvin in this extensive case was similar in nature to the quality and quantity of evidence found sufficient to support the jury's award in Porous Media." Post at 36. But the sufficiency issue in Porous Media was not whether the same evidence was used to prove both lost profits and lost goodwill. Indeed, the Court in that case concluded that the entire Lanham Act (false advertising) award of $1.6 million was supported by the record "because Porous produced sufficient evidence of loss to its goodwill." Porous Media, 173 F.3d at 1122. The Court specifically declined to resolve another question that had been raised in the case: "whether the jury found that Porous lost any sales as a result of" the defendant's actions. Id.; see also id. at 1123 ("[B]ecause Porous produced sufficient evidence of lost goodwill, we need not resolve the parties' disagreements about the jury's special verdict.").

-17-

must be measurable. The problem is not so much that lost goodwill and future lost profits are duplicative in this case (in fact, the jury was instructed that they are different from each other). The problem is that Marvin did not make a submissible case of lost goodwill damages. There was no testimony that any Marvin entity was worth less because of the problems with PILT and certainly no evidence giving a measure of, or a way of measuring, how much less. A loss of goodwill resulting in a quantifiable diminution in the value of Marvin's millwork businesses was not shown with sufficient certainty, as a matter of law, to have been submitted to the jury. The award of goodwill damages must be vacated.

B.

As for lost profits, past and future, PPG also challenges the sufficiency of the evidence to support those awards. PPG maintains there was only a scintilla of evidence of past lost profits and no evidence of lost profits from 2002 through 2004. On appellate review, when the issue is sufficiency, we view the evidence in the light most favorable to the verdict and will reverse only if a reasonable jury could not have found as this jury did. United States v. Larry Reed & Sons P'ship, 280 F.3d 1212, 1214 (8th Cir. 2002). Consequential damages such as the lost profits in question must be proved "with a reasonable degree of certainty and exactness." County of Blue Earth v. Wingen, 684 N.W.2d 919, 924 (Minn. Ct. App. 2004) (citation to quoted case omitted). For future losses specifically, Marvin cannot collect damages that are "remote, speculative, or conjectural." Pietrzak v. Eggen, 295 N.W.2d 504, 507 (Minn. 1980). Absolute exactitude is not required, however. "Instead, the plaintiff must prove the reasonable certainty of future damages by a fair preponderance of the evidence." Id. We think the record evidence satisfies these requirements.

We have carefully reviewed the record (no small task in this case). There most definitely was evidence that Marvin's profits had suffered since the problems with

PILT began to surface, and that they likely would remain flat. PPG's quarrel with the sufficiency of that evidence appears to have its roots in the fact that the evidence came in largely through the testimony of Marvin senior executives Susan Marvin and Jake Marvin, who based their testimony on their review of the company's financial records.[9] PPG also complains that the witnesses focused only on selected years, instead of all years, resulting in skewed calculations of Marvin's projected growth but for the PILT problems. But PPG had the opportunity to—and did—cross-examine Marvin's witnesses on these points, using the demonstrative exhibit prepared by Marvin that noted profits for all the years in question. To the extent that PPG is challenging the court's admission of the evidence in question, we see no abuse of discretion. And we think the evidence before the jury proved lost profits, past and future, and the amounts thereof, with the required degree of certainty. The jury heard it all and determined an award was in order. We cannot say that no reasonable juror could have found that Marvin's damages from the failure of PILT to work as warranted included $52.2 million in past and future lost profits.

V.

PPG contends that Marvin's evidence of breach and causation was not admissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) ("We conclude that *Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping'

---

[9]PPG cites Racicky v. Farmland Industries, Inc., 328 F.3d 389, 397 (8th Cir. 2003), in a letter submitted under Rule 28(j) of the Federal Rules of Appellate Procedure for the proposition that the award of lost profits was speculative because it was based only on testimony of the owners and was unsupported by expert testimony or financial data. PPG is mistaken for at least two reasons. First, the Racicky Court was interpreting Nebraska law in a tort case, which specifically requires financial data be admitted in support of a claim for lost profits before such damages can be awarded. And second, the testimony of Jake and Susan Marvin **was** based on financial data.

obligation—applies not only to [expert] testimony based on 'scientific' knowledge, but also to [expert] testimony based on 'technical' and 'other specialized' knowledge." (citing Fed. R. Evid. 702)). According to PPG, the District Court failed in its gatekeeping role when it allowed testimony regarding the results of statistical studies that were conducted by one of Marvin's experts, Dr. Frank Martin, which PPG claims was the only evidence of breach and causation.

PPG's arguments are drawn largely from purported deviations from the Federal Judicial Center's Reference Manual on Scientific Evidence 2d (2000). It goes without saying that the Manual does not have the force of law, nor are judges required to follow it. The reference guides therein, including the one on statistics, "are not intended to instruct judges concerning what evidence should be admissible or to establish minimum standards for acceptable scientific testimony." Reference Manual at vi. We do not review Martin's adherence vel non to the standards recommended in the guide. Our only question is whether the District Court abused its discretion in allowing Martin to testify about the results of his studies. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (standard of review). That is, was the evidence sufficiently relevant and reliable to be put before the jury. See Kumho Tire, 526 U.S. at 152 ("The objective of [Daubert's gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.").

Martin was a statistician who was hired by Marvin in 1994 to evaluate the mounting wood-rot data Marvin was collecting. Over time, he conducted a series of statistical studies analyzing the information. He was permitted to testify to two conclusions based on those studies: first, PILT-treated windows did not outlast Penta-treated windows, and second, the excessive wood-rot problems that Marvin was experiencing in its products were the result of the failure of PILT as a wood preservative.

-20-

PPG challenges Martin's "methodology" and the "reliability" of the studies' results, invoking these catchwords relating to the admissibility of expert opinion testimony under Rule 702 of the Federal Rules of Evidence. See, e.g., Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001). Specifically, PPG complains that the studies were done in anticipation of litigation; that data was collected by an employee of Marvin's legal department who was aware of the purpose of the studies; that the sample size was too small and the samples were not taken from a representative geographical cross-section; that "Martin failed to perform elementary tests of reliability"; and that the studies did not account for factors other than the wood preservative that could have caused the wood deterioration. Brief of Appellant at 51. As we see these arguments, PPG's challenge is primarily to the factual basis for Martin's analysis, not to its evidentiary reliability. Generally, even post-Daubert, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." Bonner, 259 F.3d at 929 (citations to quoted cases omitted). To the extent PPG's complaints about Martin's studies are well-founded, they go to the weight to be accorded his opinions by the jury. It was PPG's responsibility at trial, through careful cross-examination of Martin and direct examination of its own experts, to alert the jury to the weaknesses in the factual basis of Martin's opinion—and from our review of the record, PPG attempted to do just that. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). But the jury believed Martin and the other Marvin witnesses and it is not for us to second-guess that reasonable decision.

In sum, we hold that the District Court did not abuse its considerable discretion in allowing Martin's testimony.

## VI.

PPG next argues that the jury's decision that Marvin's suit was timely filed—the statute of limitations issue we mentioned in Part II and footnote 3—was tainted by the District Court's instruction on equitable estoppel. The jury was instructed that the statutory period could be "tolled or . . . temporarily suspended" if Marvin had shown that it reasonably relied on representations made by PPG (such as a "promise of future action") and that Marvin would be harmed if the statute of limitations was not tolled. Transcript at 10851. The District Court has broad discretion in instructing the jury, and absent an abuse of that discretion and an encroachment upon the substantial rights of PPG, a new trial will not be ordered. Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 867 (8th Cir. 2004).

We have reviewed the record and conclude that it was not an abuse of discretion to give the instruction. Although it did not consume many pages of the voluminous transcript in this case, there was some evidence that PPG early on, when PILT was suspected as the wood-rot culprit, made representations to Marvin about making things right. Given the close and long-standing relationship between PPG and Marvin, and among individual employees of each company, a jury could easily find that Marvin would rely on those representations.

The District Court did not abuse its discretion in giving the equitable estoppel instruction.

## VII.

Finally, PPG charges that Marvin tried its alleged fraud and general warranty claims that we dismissed in Marvin I, and the District Court erred in allowing it to do

so. PPG's argument consists of a laundry list of claims: evidentiary errors, inflammatory examination of witnesses by Marvin, instructional errors, improper argument, and sufficiency questions. PPG maintains that the errors require that it be given a new trial.

We will reverse the District Court's denial of PPG's motion for a new trial only if the court clearly abused its discretion. Children's Broad. Corp., 357 F.3d at 867. We decline to enumerate PPG's claims of error and explain for each why PPG is not entitled to a new trial. Suffice it to say that we have considered each claim of error and now reject all of them, holding that either the claims were not preserved for appellate review absent plain error (and there is none), the District Court did not abuse its discretion in its rulings, or errors the court did make were not prejudicial to PPG. See, e.g., id. at 864 (noting there must be a clear and prejudicial abuse of discretion for this Court to grant a new trial based on error in admitting evidence); id. at 867 (explaining that instructional error must have affected substantial rights to be reversible); Ratliff v. Schiber Truck Co., 150 F.3d 949, 957 (8th Cir. 1998) (stating that the district court must have abused its discretion in controlling closing argument to be reversed on appeal, and that we review only for plain error any issues not properly preserved).

This was a very long trial, and frankly, we think the District Court on balance did a fine job of ruling on the potential sources of error. For the asserted errors PPG pulls together in its sixth and final argument, we have considered each one and see nothing that requires us to order a new trial.

VIII.

We turn now to Marvin's cross appeal.

-23-

A.

For its first issue, Marvin contends it was entitled to preverdict interest, as provided by Minnesota law, on "pecuniary damages" (except awards for future damages) calculated "from the time of the commencement of the action." Minn. Stat. § 549.09 subd. 1(b) (2002); id. subd. 1(b)(2) (noting no preverdict interest is allowed for "judgments or awards for future damages"). The District Court declined to award interest from the start of the lawsuit on damage amounts that had not been incurred at the time the complaint was filed. Marvin contends that the statute is unambiguous and that the District Court therefore had no choice but to award interest on all "pecuniary damages" (except awards for future damages) from April 22, 1994, the date Marvin filed suit, regardless of when the damages were incurred. We review the District Court's decision on its authority to award damages de novo and any challenge to the calculation for an abuse of discretion. Children's Broad. Corp., 357 F.3d at 868. We agree with Marvin that the decision here, one interpreting the Minnesota statute, is reviewed de novo. Because the Minnesota Supreme Court has not decided the issue before us, we must predict how the state's highest court would rule if faced with the same question. See Sloan v. Motorists Mut. Ins. Co., 368 F.3d 853, 856 (8th Cir. 2004).

Because context is critical to our analysis, we set out the applicable statutory language in its entirety (with a few omissions based on relevance).

> Except as otherwise provided by contract or allowed by law, preverdict . . . interest on pecuniary damages shall be computed as provided in clause (c) **from the time of the commencement of the action** . . . except as provided herein. . . . If either party serves a written offer of settlement, the other party may serve a written acceptance or a written counteroffer within 30 days. **After that time**, interest on the judgment or award shall be calculated by the judge . . . **in the following manner**. The prevailing party shall receive interest on any judgment or award from the time of commencement of the action . . . , or **as to**

-24-

> **special damages from the time when special damages were incurred, if later**, until the time of verdict . . . only if the amount of its offer is closer to the judgment . . . than the amount of the opposing party's offer.

Minn. Stat. § 549.09, subd. 1(b) (emphasis added). The statute goes on to explain how the calculation is made if the losing party's settlement offer was closer to the judgment.[10]

Preverdict interest is not conventional "interest" because it cannot be calculated until after the verdict. Lienhard v. State, 431 N.W.2d 861, 865 (Minn. 1988). "Rather, it is an element of damages awarded to provide full compensation by converting time-of-demand . . . damages into time-of-verdict damages." Id. But full compensation is not the exclusive purpose of preverdict interest in Minnesota. As the state court of appeals has recognized, in order "to promote settlements," the state legislature amended the statute in 1984 to omit a previous requirement that damages be liquidated or readily ascertainable before preverdict interest would accrue. Skifstrom v. City of Coon Rapids, 524 N.W.2d 294, 297 (Minn. Ct. App. 1994). Before 1984, "[t]he interest obligation of the common law provided a motivation to settle with respect to 'ascertainable' damages" but none as to those—such as unincurred expenses—that were not so readily determined. Id. (explaining legislative purpose of § 549.09 in applying provision for preverdict interest to damages for pain and suffering in negligence action). Both purposes are served by starting the clock running on preverdict interest when suit is filed. The prevailing party is fully compensated (indeed, more than fully compensated when preverdict interest is ordered on damages that were not incurred when suit was filed). And the manner of calculating preverdict interest when settlement offers are made, as set forth in the

_____

[10]We express no opinion on whether the damages at issue in this case were "special" within the meaning of Minnesota law. It is not necessary for us to do so because there is no indication from the parties that any written settlement offers were made in this litigation.

-25-

statute, surely should encourage at least good-faith efforts at settlement, especially when potentially large unincurred special damages may be in play.[11]

There is a case wherein the Minnesota Court of Appeals has said, "Whether interest on the judgment accrues from the time the action is commenced or the time damages were incurred depends upon the nature of the damages." Tyroll v. Private Label Chems., Inc., 493 N.W.2d 128, 132 (Minn. Ct. App. 1992), rev'd in part on other grounds, 505 N.W.2d 54 (Minn. 1993). The court went on to quote a part of the statute as follows: "The prevailing party shall receive interest on any judgment or award from the time of commencement of the action * * * , or as to special damages from the time when special damages were incurred, if later, until the time of verdict." Id. (quoting Minn. Stat. § 549.09, subd. 1(b) (1990)).[12] But this quote is out of context, and the omitted language changes the meaning of the statute altogether. The reference to interest calculation "when special damages were incurred" applies only **after** one or more settlement offers have been made. Minn. Stat. § 549.09, subd. 1(b) (2000) ("If either party serves a written offer of settlement, the other party may serve a written acceptance or a written counteroffer within 30 days. **After that time**, interest . . . shall be calculated . . . in the following manner."). Reading the statute in its entirety makes that clear. The statute relieves the losing party, to a degree, from the obligation to pay preverdict interest on special damages incurred after suit was filed—that is, such interest does not accrue until special damages are incurred—if,

---

[11]In Minnesota's neighboring state of Iowa, the highest court has held, "We do not believe the legislature intended to have prejudgment interest assessed on amounts due on transactions that did not occur until after the litigation commenced." Rowen v. LeMars Mut. Ins. Co., 347 N.W.2d 630, 641 (Iowa 1984). We do not believe the Minnesota Supreme Court would follow suit, however, because the Iowa prejudgment statute at the time made no mention of settlement offers and clearly did not have the same goal of encouraging settlement as does the Minnesota statute.

[12]The 1990 version of § 549.09, subdivision 1(b), has been amended but is the same in relevant part as the 2002 version.

and only if, that party has made some legitimate attempt to settle the dispute. While the statute might not have been artfully drafted, it is not ambiguous in its intention to allow preverdict interest on **all** pecuniary damages from the time suit was filed, assuming no written settlement offers were made in the course of the litigation.

The District Court read "the explicit language of the statute, '[e]xcept as otherwise provided by contract or allowed by law,' to permit alternative calculations." Order and Memorandum of June 7, 2002, at 17. The court also cited Minnesota law that interpreted the 1984 amendments as allowing preverdict "interest in situations where it was not already provided for by law." Id. (citing Seaway Port Auth. v. Midland Ins. Co., 430 N.W.2d 242, 252 (Minn. Ct. App. 1988)). The court recognized § 549.09 as amended in 1984 as **expanding** a prevailing party's rights to preverdict interest. Indeed, the statute compels the computation of preverdict interest from the date suit was filed except as "otherwise . . . **allowed** by law," not as otherwise restricted by law. But the court's calculation of such interest on damages not yet incurred when suit was filed is not true to the Minnesota legislature's intent. We conclude that the Minnesota Supreme Court would read the plain language of § 549.09 and hold that Marvin was entitled to preverdict interest on all pecuniary damages (except future profits) from the inception of the litigation, regardless of when the damages were incurred.[13]

Accordingly, we remand to the District Court for the recalculation of preverdict interest consistent with this opinion.

---

[13]In its short response to Marvin's argument, PPG argues that awarding prejudgment interest as Marvin suggests would be illogical, "absurd," and in violation of Minnesota law on statutory interpretation. Reply Brief of Appellant/Cross Appellee at 42. The state and federal constitutional arguments put forward by Judge Beam in his concurring and dissenting opinion never were raised by PPG.

B.

In Marvin I, we affirmed the dismissal of Marvin's claims brought under Minnesota statutory law and held that "[i]n the circumstances of this case, the Minnesota consumer protection statutes do not apply to a merchant such as Marvin." 223 F.3d at 887. Marvin now says that a case from the Minnesota Supreme Court decided in January 2001 requires that the claims be reinstated. See Group Health Plan, Inc. v. Philip Morris, Inc., 621 N.W.2d 2 (Minn. 2001). According to Marvin, "the jury's verdict establishing PPG's liability for breach of warranty establishes PPG's liability under Minnesota's consumer protection and anti-fraud statutes." Brief of Appellee/Cross Appellant at 83.[14] Damages would thus be duplicative, but Marvin contends it is entitled to attorney fees, costs, and expenses under the fee-shifting provisions of the law, with no further proceedings required. The District Court denied Marvin's motion to revive the claim before trial. Since Marvin is appealing the court's interpretation of state law, we review de novo. Salve Regina Coll., 499 U.S. at 231. We will revisit our decision in Marvin I if the intervening decision from Minnesota's highest court in Group Health "clearly demonstrates the law of the case is wrong." Madison v. IBP, Inc., 330 F.3d 1051, 1059 (8th Cir. 2003) (quoting Morris v. Am. Nat'l Can Corp., 988 F.2d 50, 52 (8th Cir. 1993)).

We agree with PPG that Marvin is mistaken on the law. In the first appeal, we held that Marvin's statutory claims did not survive dismissal because Marvin is a merchant, not a consumer. In Group Health, no merchants were involved. The plaintiffs who were seeking to invoke the statutes were HMOs (health maintenance organizations) that insured consumers of the product in issue (tobacco). "Although the Minnesota Supreme Court held that a plaintiff need not be a purchaser of the defendant's product in order to properly plead a claim under the CFA [Minnesota

---

[14]Because it is not necessary for us to do so, we do not decide whether this is a correct statement of the law.

Prevention of Consumer Fraud Act], the case involved plaintiffs who were, in effect, indirect consumers of the defendant's products . . . ." Popp Telecom, Inc. v. Am. Sharecom, Inc., 361 F.3d 482, 493 n.12 (8th Cir. 2004) (citation omitted). There was no mention of consumers vis-à-vis merchants in Group Health. The court was answering the certified question, "[M]ust plaintiffs be purchasers of defendants' products in order to properly plead a claim under" the provisions in question? Group Health, 621 N.W.2d at 5. The court answered the question in the negative: "The HMOs need not be actual purchasers of the tobacco companies' products in order to properly plead claims under" the statutes. Id. at 11. If the Minnesota Supreme Court thought we got it wrong in Marvin I, one would expect that the court would have mentioned it in its opinion in Group Health four months later—the opinion that, according to Marvin, clearly resolved the question in its favor.

Because Marvin cannot show that the decision in Group Health "clearly undermines our earlier rulings" on the Minnesota statutory law issues, the law of the case from Marvin I prevails. Madison, 330 F.3d at 1059. The District Court is affirmed on this second issue in Marvin's cross appeal.

IX.

The judgment of the District Court is affirmed in part and vacated and reversed in part. The case is remanded to the District Court for recalculation of damages and interest in accordance with this opinion.

BEAM, Circuit Judge, concurring and dissenting.

I concur in the court's opinion, except for its conclusion that Marvin is entitled to preverdict interest on unincurred damages. I very respectfully suggest that a plain reading of the preverdict interest statute indicates that interest may be assessed on damages only after they are actually incurred after commencement of the action.

-29-

Accordingly, I dissent on that issue. And, for me this is not just an interesting analytical exercise. The court's interpretation transfers, according to my calculations, nearly $14 million of PPG's assets to Marvin simply because PPG had the temerity to submit an extremely close products liability question to the district court for its adjudication.

Resolution of the preverdict interest matter turns on the interpretation of section 549.09 of the Minnesota statutes. Marvin argues that the proper interpretation is found in the plain language of the statute. I agree. Where I part company with Marvin and the court is on the issue of what the statute plainly says and how you properly construe existing Minnesota case law on the subject.

The district court calculated interest on Marvin's out-of-pocket costs, past lost profits, and third-party litigation costs, declining to assess "interest" for any periods of time before the damages were actually incurred. I agree with that decision and would affirm the district court insofar as it assessed interest on damages from the time they were incurred after commencement of the action.

As the court notes, since the Minnesota Supreme Court has not specifically decided this issue, it falls to us to predict how that court would interpret the statute. In so doing, we are bound by Minnesota's rules of statutory interpretation. See Gershman v. Am. Cas. Co. of Reading, PA, 251 F.3d 1159, 1162 (8th Cir. 2001). "If statutory language is plain and unambiguous, the court must look only to the plain meaning of the statutory language." Boutin v. LaFleur, 591 N.W.2d 711, 715 (Minn. 1999). "Words and phrases are to be given their ordinary meaning." State v. Larivee, 656 N.W.2d 226, 229 (Minn. 2003), cert. denied, 540 U.S. 812 (2003); see also Minn. Stat. § 645.08 (providing, as a canon of statutory construction, that words are to be construed "according to their common and approved usage"). The statute provides that preverdict interest on pecuniary damages is to be computed from the time of

commencement of the action.[15]  There is nothing ambiguous about the words of the statute, so I believe the Minnesota Supreme Court would simply apply their ordinary meaning.

The ordinary meaning of the statute's reference to "pecuniary damages" has been clearly addressed by Minnesota courts.  They are damages that are "'[m]onetary; relating to money; financial; consisting of money or that which can be valued in money.'"  Skifstrom v. City of Coon Rapids, 524 N.W.2d 294, 295 (Minn. Ct. App. 1994) (quoting Black's Law Dictionary 1131 (6th ed. 1990)).  The money damages Marvin seeks, no matter when they were incurred, are, of course, "pecuniary."

What must be considered, however, is that section 549.09 is an *interest* statute. Interest is "a sum paid or charged for the *use of money* or for borrowing money." The Random House Dictionary of the English Language 993 (2d ed. 1987) (emphasis added).  Minnesota courts that have examined section 549.09 are in accord.  "[P]re-verdict interest is compensation 'allowed by law as additional damages *for loss of use of the money due* as damages.'"  Lienhard v. State, 431 N.W.2d 861, 865 (Minn. 1988) (quoting C. McCormick, Law of Damages § 50, at 205 (1935)) (emphasis added).  Clearly, for PPG to have deprived Marvin of its use of the monies included in the damages award, Marvin must have been entitled to those funds.  Marvin was simply not entitled to those amounts until it incurred damages for which it could hold PPG responsible.  Before damages are incurred, they are only hypothetical, and I can find no instance of Minnesota law directing that "interest" be assessed on hypothetical damages.  And to interpret section 549.09 to direct otherwise is to flout Minnesota rules of statutory interpretation.  "In ascertaining the intention of the legislature the courts may be guided by the following presumptions:  (1) The legislature does not intend a result that is absurd, impossible of execution, or

---

[15]Special provisions for calculating interest apply where there have been written offers of settlement.  Since there is no indication from the parties that any written offers were made in this case, those provisions are not useable.

-31-

unreasonable." Minn. Stat. § 645.17(1). Charging interest on possible damages for a period of time before they even exist is, at best, unreasonable.

It is true that in Lienhard, the court declared that, in Minnesota, "pre-verdict interest is not conventional interest on a sum of money." 431 N.W.2d at 865. But the court explained that this is so only in the sense that "such 'interest' cannot be calculated *until the amount on which interest is allowed has been fixed by verdict*." Id. (emphasis added). Thus, the court in Lienhard recognized that preverdict interest in Minnesota was unique not because it can be applied to *unincurred* damages, but because it can be applied to damages that have indeed been incurred, but remain *unascertained* in amount until a jury sets the sum.

The court correctly notes that under Minnesota law, section 549.09 serves two purposes: "(1) to compensate prevailing parties for the true cost of money damages incurred, and (2) to promote settlements when liability and damage amounts are fairly certain and deter attempts to benefit unfairly from delays inherent in litigation." Solid Gold Realty, Inc. v. Mondry, 399 N.W.2d 681, 683 (Minn. Ct. App. 1987). But today's decision by the court is not true to the first purpose, and unnecessary for the second.

As to the first purpose, to award Marvin preverdict "interest" on unincurred damages does not *compensate* Marvin "for the *true cost* of money damages incurred." Id. (emphasis added). Rather, as the court concedes, Marvin is *over*compensated, by an amount that does not represent any use or deprivation of money.

The second purpose is fully addressed by allowing interest to accrue on damages from the time they are incurred. All that remains under that scenario is an ultimate determination of amount. Interest assessed against this currently unknown and uncertain but ultimately ascertainable element is and will always be a persuasive factor in the calculus of whether a party wishes to proceed to trial. Thus, I am left

with no reason to believe that my view of the plain meaning of the statute diminishes its power to promote early settlement.

The court references <u>Skifstrom</u> to note that the 1984 amendments to section 549.09 were intended to motivate settlement even where the amount of damages was unascertained. But the damages with which the court in <u>Skifstrom</u> dealt were not unincurred; they were merely unascertained–that is, incurred, but not yet quantified. "The interest obligation of the common law provided a motivation to settle with respect to 'ascertainable' damages, but not as to *general damages for pain and suffering . . . .*" 524 N.W.2d at 297 (emphasis added). Pain and suffering damages are those that have certainly been incurred as a part of the central claim in a case, but are not quantified until a jury determines their worth. It is that aspect of "unascertained" to which the court in <u>Skifstrom</u> was referring, and including unincurred damages under that case's rationale, as the court does here, does not fit within the plain words of the statutory language.

Indeed, the court's interpretation of section 549.09 exceeds what is necessary to *encourage settlement*. The resulting "surcharge" operates either to *punish* unsuccessful litigants for having resorted to the courts, or to charge them for use of the courts in order to *discourage litigation*. Either result, of course, raises problems under both the Minnesota and United States Constitutions. In <u>Harrison v. Springdale Water & Sewer Commission</u>, 780 F.2d 1422 (8th Cir. 1986), we stated that

> An individual's constitutional right of access to the courts 'cannot be impaired, either directly . . . or indirectly, by threatening or harassing an [individual] in retaliation for filing [or defending] lawsuits. . . . [S]tate officials may not take retaliatory action against an individual designed either to *punish* him for having exercised his constitutional right to seek judicial relief or to *intimidate or chill* his exercise of that right in the future.

Id. at 1427-28 (first and second alterations in original) (emphasis added). Since Minnesota case law commands that its courts "interpret statutes in a way that avoids constitutional problems," Hince v. O'Keefe, 632 N.W.2d 577, 582 (Minn. 2001), it is difficult to believe that the Minnesota Supreme Court would interpret section 549.09 in a way that raises these very serious concerns.

The Minnesota constitution guarantees that "[e]very person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice *freely and without purchase*, completely and without denial, promptly and without delay, conformable to the laws." Minn. Const. art. 1, § 8 (emphasis added). The First Amendment to the United States Constitution also guarantees access to the courts. "'The right of petition is one of the freedoms protected by the Bill of Rights.'" Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) (quoting E. R.R. Presidents Conference v. Noerr Motor Freight, 365 U.S. 127, 138 (1961)). "The right of access to the courts is indeed but one aspect of the right of petition." Id. "[T]he right to petition is 'among the most precious of the liberties safeguarded by the Bill of Rights.'" Harrison, 780 F.2d at 1427 (quoting United Mine Workers of America, Dist. 12 v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967)). As such, "it has 'a sanctity and a sanction not permitting dubious intrusions.'" Id. (quoting Thomas v. Collins, 323 U.S. 516, 530 (1945)). "'[A]ccess to the courts is a fundamental right of every citizen.'" Id. (quoting Inmates of the Neb. Penal and Corr. Complex v. Greenholtz, 436 F. Supp. 432 (D. Neb. 1976)).

The court's interpretation of the statute also implicates the Fifth Amendment Takings Clause. Absent any purpose of punishment for bringing a case or charging for the use of the courts, this surcharge is purely a government-enforced transfer of property (in this case, money) from one private party to another without any lawful basis for doing so. "The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property

rights except for a 'public use' and upon payment of 'just compensation.'" Lynce v. Mathis, 519 U.S. 433, 440 n.12 (1997) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 266 (1994)). "It applies to the States as well as the Federal Government." Brown v. Legal Found. of Wash., 538 U.S. 216, 232 n.6 (2003). And "one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." Thompson v. Consol. Utils. Gas Corp., 300 U.S. 55, 80 (1937). Charging interest for damages that do not exist cannot be justified as either a public purpose or a valid private purpose enforceable through government action, here the United States Courts.

"We interpret statutes to avoid serious constitutional problems, so long as the statutory language is fairly susceptible to a constitutional construction." Planned Parenthood of Mid-Missouri and E. Kan., Inc. v. Dempsey, 167 F.3d 458, 463 (8th Cir. 1999). The "constitutional construction" of which this statute is "fairly susceptible" allows preverdict interest to be assessed on damages only from the time they are incurred, not earlier.

Based on a plain reading of section 549.09 of the Minnesota statutes, Minnesota's rules of statutory construction, Minnesota preverdict interest case law, and potential constitutional problems, I believe the correct pre-verdict interest calculation assesses interest from the time the damage is incurred after commencement of the action. This comports with the statute's dual purpose while avoiding constitutional infirmity. It is for these reasons that I would affirm the district court insofar as it assessed preverdict interest in this manner, and therefore must respectfully dissent from today's decision by the court on that particular matter. I concur in all other respects.

BYE, Circuit Judge, concurring in part and dissenting in part.

I concur in the Court's opinion with the exception of Section IV(A), which eliminates the jury's finding and award of $30 million for lost goodwill. The Court vacates the award for such damages after concluding Marvin failed to quantify adequately the precise amount of its lost goodwill. I believe Marvin adequately proved this separate element while presenting its evidence on the damages sustained and would therefore affirm the award to include the loss of goodwill as determined by the jury, thus reflecting a basic human tendency to do business with a merchant who takes pride in its business reputation and who offers products of the type and quality which the customer desires and expects, and of a type which is separate and distinct from all other categories of business damages.

"Reputational damages are often difficult to quantify." Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1122 n.12 (8th Cir. 1999). As a result, a plaintiff alleging lost goodwill "need not prove such damages with exacting precision." Id. I believe the quality and quantity of evidence presented by Marvin in this extensive case was similar in nature to the quality and quantity of evidence found sufficient to support the jury's award in Porous Media, see id. at 1122 (summarizing evidence of the loss of, and difficulty with, customers similar to the evidence presented by Marvin), with one exception. In Porous Media, a witness quantified the loss of goodwill by giving the jury a general estimate of the amount, "between $5 million and $10 million." Id. Here, while Marvin presented persuasive and compelling evidence of substantial lost goodwill, no expert witness was specifically asked to gauge the amount.

Marvin's evidence was, however, clearly sufficient to prove a loss of goodwill. The company's principal officers established the importance of the company's well-deserved reputation for manufacturing premium, high-quality products spanning a time period of several decades. For example, Susan Marvin testified "[w]hen [our customers] purchase Marvin, they purchase what they believe to be [] a premium

product.  It's advertised as best of quality.  It's made to be best of quality [and] they have said, my home is important to me.  I'm going to put the best in it."  App. 838-39. Jake Marvin testified to Marvin's product as being a "high-end window" and a "premium product" frequently specified by architects for both new home construction as well as the replacement segment of their window business.  App. 956.  The jury repeatedly heard about how important it was to Marvin's business plan, reputation, and success in the industry to stand behind all of its products,  App. 516, 854, 602, a reputation which was confirmed by Marvin's competitors,  App. 498.

In addition, the jury heard detailed accounts of the problems Marvin encountered with its customers and the damage to its goodwill caused by the PILT problems, as summarized by the Court at pages 16-17 of its opinion. The Court while not specifically alluding to it does describe how the jury learned about the PILT problems and the direct effects on Marvin's cash reserves.  In 1994, prior to the worst of the PILT problem, Marvin's financial statements revealed cash and securities reserves in the amount of $75,880,369.  App. 1320.  By 1998, at the height of the PILT problem, Marvin's cash and security reserves had shrunk by over $40 million to $34,989,949.  Id.  Marvin also presented evidence as to how this severe downturn in its cash reserves negatively impacted upon and affected its ability to obtain adequate financing so as to continue its detailed plan for complete business remediation.  When Marvin approached a bank with a loan request of $125 million, the bank responded with only an offer of a $35 million loan.  App. 979-81.  It is upon such a basis and record as found here whereby lost goodwill, also known as reputational damages, are most often proved.

As stated previously, this court has already recognized that "[r]eputational damages are often difficult to quantify."  Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1122 n.12 (8th Cir. 1999).  As a result, a plaintiff alleging lost goodwill "need not prove such damages with exacting precision."  Id.  I believe the strength of evidence presented by Marvin in this case was equal to or exceeded the type of

evidence found sufficient to support the jury's award in <u>Porous Media</u>. <u>See</u> <u>id.</u> at 1122 (summarizing the evidence presented by the plaintiff to support an award of damages based on lost goodwill).

This court is in a far less favorable position than is either the district court, or more to the point, its petit jury, in the determination and/or adequacy of lost goodwill damages. Here, I would sustain the damages as found and determined by the jury, which were left intact by the district court as an important, distinct, necessary, and separate component of Marvin's overall business damage and loss as established during the jury trial. I would therefore affirm the jury's damage award in every respect.

_____